**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| IN RE: | ) | |
| | ) | Chapter 11 |
| CURARE LABORATORY LLC | ) | |
| | ) | |
| Debtor | ) | Case No. 21-31588 |
| | ) | |

---

**MEMORANDUM OPINION AND ORDER**

---

This matter is before the Court on the *Objection to Nunc Pro Tunc Application to Employ Kaplan Johnson Abate & Bird LLP* (the "Objection"), [D.E. 138], filed by Solar Holdings Group, LLC ("Solar") and Dr. Praveen Arla ("Arla"), and the *Response* (the "Response to Objection"), [D.E. 148], filed thereto by Curare Laboratory LLC (the "Debtor"). For the reasons below, the Court **OVERRULES** the Objection.

## I.    PROCEDURAL HISTORY

This case arises out of a dispute over the majority ownership interest in Bluewater Toxicology, LLC ("BWT"), a medical testing and diagnostics company. Initially, Solar, a company owned by Jennifer Bolus ("Bolus") and Arla, held 100% of BWT's membership interests. In September of 2017, Solar entered into a Securities Purchase Agreement (the "SPA") with the Debtor to transfer 80% of BWT to the Debtor for $3,750,000. When the relationship between Solar and the Debtor soured soon after, Solar filed an action against the Debtor in Fayette Circuit Court on December 15, 2017. In circuit court, Solar filed a Motion to take Possession, Custody and Control of all Bluewater Assets, Accounts, and Property Based on Abandonment, and on July 30, 2018, the Fayette Circuit Court entered an order transferring possession, custody

and control of BWT's assets, accounts, and property to Solar and Bolus pending final adjudication on the merits, which ultimately gave rise to the present dispute over BWT's ownership in this case. The circuit court litigation largely remained dormant for the next few years until the court indicated it would dismiss the proceeding for lack of prosecution if the parties took no further action, prompting Solar to file a motion for summary judgment on July 19, 2021. Additionally, the Debtor's ownership changed hands during this time; on or around July 26, 2021, the Debtor's initial manager Kevin Liske entered into an agreement through which Liske transferred all of his interest in the Debtor to an entity called JJSquared, and that entity's owner Tyler Burke was subsequently appointed as the Debtor's new manager responsible for controlling all of Debtor's operations. [D.E. 211-51, 211-52]. Because the Debtor is a manager-managed LLC, the change in ownership effectively changed the company's management.

On July 29, 2021 (the "Petition Date"), the Debtor filed the underlying Chapter 11 petition for bankruptcy relief, hiring Kaplan Johnson Abate & Bird LLP ("Kaplan") as its attorneys for the Chapter 11 proceeding. Kaplan's attorneys shortly thereafter filed a notice of appearance ("NOA") on behalf of the Debtor in the Fayette Circuit Court case. On August 30, 2021, the Debtor filed its *Nunc Pro Tunc Application to Employ Kaplan Johnson Abate & Bird LLP as Attorney* (the "Employment Application"), [D.E. 51], in which it sought to retain Kaplan under section 327(a) in the Chapter 11 proceeding. With no objections filed, the Court entered an Order approving the Debtor's retention of Kaplan on September 21, 2021. [D.E. 88].

Immediately after the initiation of this Chapter 11 proceeding, the Debtor filed an *Expedited Motion to Remove Custodian* (the "Custodian Motion"), [D.E. 3], and both BWT and Solar/Bolus filed objections thereto, [D.E. 16, 18], prompting the Court to set an evidentiary

2

hearing (the "Evidentiary Hearing") on those matters for November 3-4, 2021.[1]  Once the Evidentiary Hearing was scheduled, the parties engaged in a period of rapid, intense discovery during which they filed dozens of notices to take depositions and motions to conduct examinations pursuant to Federal Rule of Bankruptcy Procedure 2004 ("Rule 2004").  Among all parties, a total of thirty-one depositions and six Rule 2004 exams were taken in the weeks leading up to the evidentiary hearing.[2]

On October 18, 2021, the Debtor initiated an adversary proceeding against Solar, BWT, and Bolus (the "AP")[3], and filed an accompanying Motion for Injunctive Relief to prevent the alleged continuing dissipation of assets by the defendants.[4]  On October 21, 2021, as part of its discovery requests in the main case, the Debtor filed a notice to take Arla's deposition.  [D.E. 122].  On October 25, 2021, Arla filed an *Emergency Motion for Protective Order* (the "EMPO"), [D.E. 127], in which he claimed to have an attorney-client relationship with Kaplan both personally and through certain corporate entities.[5]

Then on October 27, 2021, Arla and Solar filed the underlying Objection seeking to disqualify Kaplan from representing the Debtor's estate in this proceeding.  Appended to the Objection were three exhibits: (i) a string of emails between Arla and Earl "Chip" Hamm ("Hamm"), a Kaplan partner, sent during the period of September 18, 2021 through October 9, 2021 (the "Corridor Emails"), [D.E. 138-2]; (ii) a single email from Hamm to Arla on October 26,

---

[1] The evidentiary hearing was rescheduled to February 15-16, 2022, [D.E. 232], to allow the parties to first attempt to mediate the dispute in January, which ultimately proved unsuccessful.

[2] *See* Orders granting 2004 exams, [D.E. 45, 46, 47, 48, 75, 168], and Exhibit Lists specifying the depositions taken by each side, [D.E. 211, 247].

[3] *See Curare Laboratory LLC v. Solar Holdings Group, LLC, Bluewater Toxicology, LLC, and Jennifer Bolus,* Adversary Proceeding 21-03025.

[4] The adversary complaint is still awaiting a ruling from the Court, pending the resolution of the underlying issues in the main bankruptcy case, which will be instructive to the outcome of the AP.

[5] Though the Court scheduled a hearing on the EMPO for October 28, 2021, the Debtor withdrew its notice to take Arla's deposition two days prior on October 26, 2021, [D.E. 130], mooting the need for a hearing on the EMPO.

2021 (the "Termination Email"), [D.E. 138-1]; and (iii) a transaction receipt Kaplan sent to Arla for work it had done on behalf of Rooster Shooter, LLC ("Rooster"), one of Arla's entities ("Transaction Receipt"), [D.E. 138-3]. These communications respectively concern certain legal work Arla wanted Kaplan to conduct on his behalf personally, Kaplan's termination of their relationship, and work that Kaplan had completed for an entity Arla owned.

In the Objection, Arla and Solar explain that Arla owns 50% of the interests in Solar, an entity which is adverse to the Debtor in this case and its attendant AP. Further, Arla and Solar allege that Kaplan represents both Arla himself, individually, and a number of entities in which Arla maintains an ownership interest. Specifically, the Objection posits that Kaplan's conflict of interest arose when it agreed to represent the Debtor while concurrently acting as Arla's lawyers. Arla and Solar argue that, as a result, Kaplan: (i) has a conflict under the Kentucky Rules of Professional Conduct since it represented Arla while concurrently representing the Debtor in a case that was adverse to his interests; (ii) represents an interest adverse to the estate in violation of section 327[6] by representing Arla, an individual whose interests are identical to those of Solar; and (iii) failed to forthrightly disclose its connections to Arla and Solar under Federal Rule Bankruptcy Procedure 2014 ("Rule 2014") in its affidavit appended to the Employment Application. Furthermore, Arla and Solar argue that Kaplan unethically attempted to solve its conflict by terminating its relationship with him in violation of the "Hot Potato" rule.[7] Taken together, Arla

---

[6] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.
[7] Courts "universally hold that a law firm will not be allowed to drop a client in order to resolve a direct conflict of interest, thereby turning a present client into a former client." *Garland v. Ford Motor Co.*, No. 2:12-00121, 2015 U.S. Dist. LEXIS 38505, at *16 (M.D. Tenn. Mar. 26, 2015) (quoting *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 623 F. Supp. 2d 863, 868 (W.D. Mich. 2007) (collecting cases)). This is commonly referred to as the "Hot Potato" doctrine or rule. *See Metro. Life Ins. Co. v. Guardian Life Ins. Co.*, No. 06-C-5812, 2009 U.S. Dist. LEXIS 42475, at *8 (N.D. Ill. May 18, 2009) (the doctrine prohibits an attorney from dropping a client "like a 'hot potato' when the more lucrative client [comes] along"). The Hot Potato rule is discussed further *infra* at 34-40.

and Solar conclude, Kaplan's conflicts and failings are so significant that the firm must be disqualified from representation of the estate in this Chapter 11 case.

On October 28, 2021, the Debtor filed the Response to Objection, asserting that: (i) Kaplan never represented Solar; (ii) Kaplan did not represent Arla individually until after it had been retained by the Debtor and filed this proceeding; (iii) where Kaplan represented an entity in which Arla was a member, Kaplan expressly limited that representation to the entity only; (iv) Arla had individual counsel for at least one of the engagements in which Kaplan represented the business entity; (v) Kaplan's representation of Arla was brief, with no confidential information transmitted to create a conflict; and (vi) the Termination Email was merely a "prophylactic measure" since Kaplan's relationship with Arla "terminated naturally." *Response to Objection* at 2. Based on these grounds, the Debtor argues that Kaplan remains a disinterested professional because no conflict of interest arose between the firm and Arla. In the alternative, the Debtor asserts that if a conflict *did* arise between Kaplan and Arla, it was not of the type that required disqualification. As to Kaplan's disclosures, the Debtor avers that they were accurate and complete, based on the facts surrounding Arla's relationship to Kaplan at the time it filed the Employment Application.

On October 28, 2021, the Court held a hearing on the Objection. The parties maintained their relative positions on Kaplan's disqualification, so the Court requested that each side provide additional briefing on the matter. On November 12, 2021, Kaplan filed a *Supplemental Statement* ("Supplemental Statement"), [D.E. 166], in which Tyler Yeager ("Yeager"), an attorney with Kaplan, asserts that Kaplan represented Green Building LLC, 146 Clay Street LLC, and Rooster, all entities in which Arla had an ownership interest and may have been a managing member. Yeager characterizes these representations as "unrelated to the Debtor, its property, or claims against the Debtor, and did not involve the attainment of any information related to Dr. Arla's

5

interest in or affiliation with Solar Holdings." *Id.* at 1. As to the representation of Arla individually, Yeager reiterates Kaplan's stance that the engagement was brief, did not involve the Debtor or Solar, and terminated naturally once Kaplan had completed the legal tasks Arla had requested.

Arla and Solar also filed their *Supplemental Memorandum* ("Supplemental Memorandum"), [D.E. 167], on November 12, 2021. Appended to the Supplemental Memorandum is an affidavit from Arla (the "First Arla Aff."), [D.E. 167-1], a copy of the decision in *Dixie Fuel Co., LLC v. Straight Creek, LLC*[8], [D.E. 167-2], Kaplan's NOA in the Fayette Circuit Court proceedings, [D.E. 167-3], the Debtor's Answer and Counterclaim from the Fayette Circuit Court proceedings, [D.E. 167-4], Kevin Liske and Larry Hancock's Response to Motion for Summary Judgment in the Fayette Circuit Court proceedings[9], [D.E. 167-5], and a copy of ABA Formal Opinion 92-367, [D.E. 167-6]. Arla and Solar's Supplemental Memorandum largely reiterates the arguments previously made in the Objection but emphasizes the direct adversity that arose when Kaplan served Arla with a subpoena, and that the Debtor—and by extension Kaplan— knew that Arla was a member of Solar since the inception of this bankruptcy.

On November 30, 2021, the Debtor filed its *Response Brief* ("Supplemental Response"), [D.E. 185], responding to Arla and Solar's Supplemental Memorandum. Appended to the Response Brief is the Affidavit of Andrew Fleischman ("Fleischman Aff."), [D.E. 185-1], a partner at Kaplan and one of the attorneys who has personal knowledge of the firm's relationship with Arla. The Response Brief reiterates the Debtor's main points that: (i) a concurrent conflict of interest never arose because the discrete legal work Arla had requested was completed by Kaplan

---

[8] No. 6:08-CV-326-GFVT, 2010 U.S. Dist. LEXIS 150126 (E.D. Ky. Mar. 25, 2010).
[9] The Court will refer to Kaplan's NOA, the Debtor's Answer and Counterclaim, and the Liske Response collectively as the "Fayette Documents."

before the Adversary Proceeding in this case was filed; (ii) even if a conflict arose, it would not have warranted disqualification; and (iii) Kaplan remained a disinterested person under section 327(a) because its representation of Arla and his entities did not qualify as an interest adverse to the estate.

On December 15, 2021, the Court set a *sua sponte* status hearing to query the parties on the necessity of conducting an evidentiary hearing on the Objection. [D.E. 200]. On December 21, 2021, the Court held the status hearing at which the parties unanimously indicated that an evidentiary hearing was unnecessary.[10] However, Arla requested leave to file additional affidavits, which the Court permitted. On January 2, 2022, Arla filed his second affidavit (the "Second Arla Aff."), [D.E. 209], while the Debtor did not file any additional affidavits.

## II.    ARLA'S RELATIONSHIP WITH KAPLAN

At the core of this dispute is the question of when Arla, in his individual capacity, became Kaplan's client. The parties agree that they first encountered one another when Kaplan took on representation of the Green Building, LLC, an entity in which Arla was a member. *Second Arla Aff.* ¶ 4; *Fleischman Aff.* ¶¶ 3-7. The parties also agree that, after their introduction, Kaplan represented various entities in which Arla held a membership interest. *Second Arla Aff.* ¶ 4-6; *Fleischman Aff.* ¶¶ 8-13. However, the parties dispute the timing and impact of Kaplan's representation of Arla as an individual.

---

[10] Where the parties mutually agreed that an evidentiary hearing on the Objection was unnecessary, the Court's findings of fact are based solely on the motions, affidavits, and the attachments thereto filed in the record. This is a sufficient basis for the Court's determination; the Sixth Circuit has held that "a decision for disqualification is adequately founded without an evidentiary hearing if the 'factual inquiry' is conducted in a manner that will allow of appellate reviews, as it is when conducted on affidavits and documents that would be acceptable under Rule 56(e) -- a condition that had not been met in [*Melamed v. ITT Cont'l Baking Co.*, 534 F.2d 82 (6th Cir. 1976)] -- and if the district judge does not undertake to decide disputed issues of fact." *Gen. Mill Supply Co. v. SCA Servs., Inc.*, 697 F.2d 704, 710 (6th Cir. 1982). Particularly where the parties unanimously agreed that an evidentiary hearing was not needed, the Court's factual inquiry is sufficient to determine whether disqualification is appropriate.

Kaplan asserts that, prior to September 18, 2021, it represented business entities in which Arla had an ownership interest but did not represent him in his individual capacity. *Fleischman Aff.* ¶¶ 3-15. In support, Kaplan points to its engagement letters with Arla's various entities which contained language limiting its representation: "Our client in this matter will be the Company and, by extension, the members, but not each of the members in an individual capacity." *Id.* ¶ 15. Kaplan also explains that in some of the transactions related to these business entities, it communicated to Arla that the firm "solely represented the interests of certain members, not including [Arla], and [Arla] acknowledged that he was advised to obtain his own counsel." *Id.* ¶ 6. The relationship changed, according to Kaplan, on September 18, 2021, when Arla contacted Hamm requesting Hamm's review of a draft operating agreement for a limited liability company Arla was forming. *Id.* ¶¶ 16-19. Kaplan insists its representation of Arla was limited to a review of that operating agreement. By Kaplan's calculation, its representation of Arla as an individual lasted twenty-one days, between September 18 and October 9 of 2021, and required 2.80 hours of Hamm's time. *Id.* ¶¶ 17-19. This representation ended on October 9, 2021, when Hamm returned a redlined copy of the operating agreement to Arla. *Id.* ¶ 17. Thereafter, according to Kaplan, no other services were performed for Arla, requested by him, or offered to him. *Id.* ¶ 19.

Arla does not directly dispute Kaplan's assertion that it initially represented only his companies. *See First Arla Aff.* ¶ 5; *Second Arla Aff.* ¶ 8. In fact, Arla asserts that Kaplan represented "my individual interests and *the interests of certain business entities for which I own an interest*," *First Arla Aff.* ¶ 5 (emphasis added), making clear that Arla understood the difference between Kaplan's representation of him versus an entity he partly owns. Further, Arla expressly "acknowledge[s] the language in the operating agreements referenced [in] [Kaplan]'s affidavit . . .

8

which state [Kaplan] only represented certain entities, not including me (Arla), in drafting the operating agreements." *Second Arla Aff.* ¶ 8.

However, Arla claims that he "always felt [he] was being advised" by Kaplan personally in these situations and specifically denies having signed, or having been asked to sign, any agreement that limited Kaplan's representation to his business entities. *Id.* ¶¶ 8-9. Moreover, Arla states that he "believe[s] Kaplan has intimate knowledge of my assets, business acumen and professional relationships." *Id.* ¶ 8. Arla accepts that his relationship with Kaplan changed on September 18, 2021, once Hamm agreed to review the operating agreements; Arla states that it was at this moment that he considered Hamm his attorney. *Id.* ¶ 6. Arla explains he was unaware of Kaplan's involvement with the Debtor and states he "did not discuss any limitation or conflicts when engaging [Kaplan's] assistance with advising me on the [limited liability company]." *Id.* ¶ 7. Furthermore, Arla states that at the time he received the Termination Email, Kaplan had not completed the legal tasks he had requested, and as such, it is inconceivable that his attorney-client relationship with Kaplan had "naturally concluded." *Id.* ¶ 11. Finally, Arla contends he did not, and would not have, consented to Kaplan's representation of the Debtor. *Id.* ¶ 10.

As stated above, Arla has tendered the Corridor Emails, the Transaction Receipt[11], and the Termination Email as part of the evidence in the record. The Corridor Emails comprise a relatively sparse communication between Arla and Hamm; on September 18, 2021, Arla initiated this communication by responding to an email Hamm sent on July 18, 2020, asking if Arla owed any outstanding invoices, and indicating he has a "couple of [operating agreements]" for Hamm to

---

[11] The Transaction Receipt is evidence that Kaplan billed Arla for work done on behalf of Rooster.

review. *Corridor Emails* at 2. In response, Hamm provided Arla with an invoice and indicated he would help with the other operating agreements. *Id.* at 3.

Thereafter, the string of emails details the drafting of an operating agreement for an entity called Corridor, LLC. One email in the Corridor string, which appears to be unrelated to the drafting of the operating agreement, is titled "Introduction" and features a person named Mike Montgomery who appears to be attempting to organize a meeting with Arla for October 18, 2021 (Hamm is copied on this email). *Id.* at 11. Though this email lacks context, Arla likely provided it to support his contention that additional work remained after October 9, 2021, when Hamm sent Arla a second version of the Corridor operating agreement. There are no communications provided by either party to account for the period between October 9, 2021 and October 26, 2021, when Hamm sent the Termination Email to Arla. In his affidavit, Arla states that the negotiations over Corridor, as well as a lease associated with the business, had not yet been finalized at the time Hamm sent the Termination Email, though Arla provides no specifics about the status of the Corridor negotiations or any deadlines that were associated with the project. *First Arla Aff.* ¶ 10; *Second Arla Aff.* ¶ 11.

As stated previously, Hamm sent Arla the Termination Email on October 26, 2021, after Kaplan, acting on behalf of the Debtor, sent Arla a subpoena to appear at a deposition. The Termination Email explains that Kaplan believes it has completed the tasks requested by Arla, but also states that the firm was "terminating its representation" of him immediately. *Termination Email* at 2. Hamm concluded the Termination Email by offering to transfer Arla's Corridor-related files to another firm. *Id.*

In addition to the Corridor Email, the Transaction Receipt, and the Termination Email, Arla filed two other documents with the Second Arla Aff.: an email dated June 28, 2020 from Hamm

to Arla about the operating agreement for Rooster ("Rooster Email"), [D.E. 209-1 at 5], and an Engagement Letter ("Engagement Letter"), [D.E. 209-1 at 1-4], setting the terms for Kaplan's representation of Rooster.  Arla provides the Rooster Email and the Engagement Letter as evidence that he was never asked to sign an engagement agreement by Kaplan, he did not have an opportunity to review any engagement letters from Kaplan, and he never agreed to any limitation of Kaplan's representation.  In relevant part, the Rooster Email states as follows:

> Praveen - I have attached for your review (1) an engagement letter for the firm regarding the representation of Rooster Shooter, LLC, and (2) a revised version of the operating agreement.  There are few substantive changes on the operating agreement, but I have revised the signature blocks and schedule of units on the last couple of pages of the document.
>
> Additionally, in completing the various documents for Rooster Shooter, LLC, I noticed a few items:
>
> - the company needs to file its annual report on the Kentucky Secretary of State web site; it expires on 6/30. […]
>
> - the Articles of Organization on the KY SOS site state that the company is "member-managed," but I believe the operating agreement was drafted for a manager-managed company; no worries, though - it's an easy fix to amend.  I noticed the BGD drafted the operating agreement, so I don't know if you would prefer for them to do it or for me to do it. Either way is fine with me.
>
> - in Section 12.1.1, the venue is Bullitt County; just confirming that is correct.
>
> If the letter is acceptable, please execute and have Ms. Herbst-McConnell execute on behalf of the other member, and send to me by PDF.

*Rooster Email* at 5.  Arla responded the next day by stating: "These look great.  Yes, Bullitt county, Yes, please take care of correcting any drafts.  The only thing is I am still trying to figure out Tax stuff of how this will all work."  *Id.*  Arla characterizes this affirmative response as relating only to the changes to the operating agreement suggested by Hamm, *Second Arla Aff.* ¶ 9, but nonetheless, Hamm attached the Engagement Letter so that Arla could review the terms of representation Kaplan proposed for Rooster.  *See Engagement Letter* at 1-4.  Furthermore, Hamm

asked Arla to sign the Engagement Letter, have the other member of Rooster sign it, and return the signed letter to Hamm as a PDF.  *Rooster Email* at 5.

Moreover, the beginning of the Engagement Letter attached to the email states that "[t]his letter will confirm our discussions with you regarding [Rooster]'s ongoing engagement of this firm and will describe the basis upon which our firm will provide legal services."  *Engagement Letter* at 1.  This is a clear statement of the terms upon which Kaplan will agree to represent Rooster. The Engagement Letter then invites Arla to review the following terms and, if he believes that modifications or changes to the terms are necessary, contact Hamm to discuss the same:

> 1. *Client; Scope of Representation*.  **Our client in this matter will be [Rooster] and, by extension, the members, but not each of the members in an individual capacity**.  We understand that the scope of our engagement will be to provide legal services to [Rooster] regarding the permitting, structure, and financing of [Rooster] to develop, market, and, potentially, produce a spirits brand.  You may limit or expand the scope of our representation from time to time (e.g., leasing, permitting, ongoing vendor contracts), provided that we both agree in writing to any substantial expansion.
>
> 2. *Authorized Representatives*.  We understand that **you will be the designated [Rooster]'s authorized representative in dealing with us in this matter**, and that **you have the authority to communicate with us regarding the status of this matter and to make all necessary decisions on [Rooster]'s behalf** in this matter.
>
> . . .
>
> 4. *Client Responsibilities*.  You agree to cooperate fully with us and to provide promptly all information known or available to you relevant to our representation. You also agree to pay our statements for services and expenses in accordance with paragraph 3 above.  **If [Rooster] is unable to make payment, you agree, individually, to complete such payments**.
>
> . . .
>
> 9. *Joint Representation*.  We have been engaged to represent [Rooster] with the understanding that each member and each [Rooster] has mutual interests in engaging a single law firm to advise the members and [Rooster] economically in connection with the matter.  It is our further understanding that although each of you could potentially have conflicting interests with respect to one or more issues

in the matter, you are giving your informed consent to be jointly represented by us in the matter.  Since this is a joint representation, all client confidences may be shared, and are not subject to being withheld, from any member of [Rooster].  **In addition, since we will not be representing any member an individual basis, each member is encouraged to consult with separate legal counsel on issues of individual concern, if any.**  Please understand, further, that should any of your individual interests become directly and materially adverse during this engagement, we may choose to address that development by withdrawing from our representation of the [Rooster] and/or advising one or more of you to retain separate counsel.

*Engagement Letter* at 1-3 (emphasis added).  Throughout the Engagement Letter, Kaplan explicitly states that they represent only the *company*, not the members individually.  In fact, the Engagement Letter encourages the membership to seek separate counsel for issues that concern them individually.  Accordingly, the Engagement Letter directly supports Kaplan's position that, prior to September 18, 2021, it did not represent Arla in his individual capacity.

The uncontested evidence demonstrates that, prior to September 18, 2021, Kaplan represented at least three business entities in which Arla had an ownership interest.  The Engagement Letter is the only evidence in the record relating to the attorney-client relationships Kaplan had with Arla's business entities, and it substantiates that Kaplan explicitly limited its representation to these entities alone.  None of the parties have provided any evidence that Kaplan represented Arla individually before September 18, 2021.  On September 18, 2021, fifty-one days after the Petition Date, Hamm agreed to represent Arla in the Corridor matter, thereby establishing Arla as an individual client of Kaplan for the first time.  This representation was brief, lasting only thirty-eight days while requiring a mere 2.80 hours of work.  Importantly, this representation did not involve the exchange of voluminous, confidential information from Arla to Kaplan.  Further, this representation did not involve any issues that overlapped or related to the Debtor, Solar, BWT, or this case.  Finally, the evidence shows that, prior to September 18, 2021, Fleischman and Hamm were the only Kaplan attorneys who interacted with Arla while representing his business entities;

after September 18, 2021, the evidence suggests that only Hamm interacted with Arla on behalf of Kaplan.

Arla attached the Fayette Documents to the Objection Memorandum to support his contention that Kaplan and the Debtor were aware of his ownership interest in Solar from the inception of this proceeding.  Although these documents do demonstrate that Kaplan appeared in the Fayette Circuit Court proceedings, and that some of the Debtor's former principals were aware of Arla's involvement in Solar, they do not demonstrate that *Kaplan* was aware of Arla's role.  The Fayette documents, other than Kaplan's NOA, were filed by firms other than Kaplan, and there is no evidence to indicate that Kaplan attorneys were aware of the content of these documents or had participated meaningfully in the Fayette Circuit Court proceedings at the time they were filed.  The Fayette Documents themselves do not concentrate on Arla's role in Solar or BWT: the Debtor's seventy-one-paragraph Answer and Counterclaim mentions Arla once, while the twenty-five-page Liske Response refers to him twice.  *See Fayette Documents*, [D.E. 167-4 and 167-5].  Each of these documents refers to Arla as a member of Solar while also referencing some role he had in the underlying transaction, but neither document makes Arla a central figure in either the underlying action or the relief it seeks from the Court.  Moreover, based on the evidence in the record, Arla was not named as a party in the Fayette Circuit Court proceedings.  In sum, it is clear that the Debtor's former managers and members were aware of Arla's role in Solar and BWT, but there is no evidence that these parties communicated their knowledge about Arla to Kaplan, nor is there evidence to suggest that Kaplan became aware of Arla's involvement in Solar before the EMPO.

III.      **LEGAL ANALYSIS**

This case concerns conflicts of interest issues governed by the Bankruptcy Code, the ethics rules adopted by the Western District of Kentucky, and relevant federal precedent.  Although these legal rubrics are concurrent and overlapping in their application, the analysis of an attorney's ethical conduct required under the Bankruptcy Code is distinct from the other sources of ethical stricture.  As such, the Court will first address the bankruptcy-specific issues before moving on to the broader ethical questions under the Kentucky Rules of Professional Conduct broached by the Objection.

In the Objection, Arla posits two grounds for the disqualification of Kaplan under the Bankruptcy Code: first, that Kaplan's disclosures were insufficient because the firm did not report its connection to him; and second, that Kaplan represents an interest adverse to the estate through its representation of him.  These issues will be addressed *seriatim* below.

A.      **Federal Rule of Bankruptcy Procedure 2014**

In accordance with section 327(a), professionals who seek employment by the trustee[12] in bankruptcy must qualify as both disinterested and devoid of an interest adverse to the estate.  *See* 11 U.S.C. § 327(a).  To enforce this requirement, Rule 2014 directs the trustee to file an application with the bankruptcy court seeking approval for the retention of the professional in question.  Fed. R. Bankr. P. 2014(a).  As part of the application, the trustee must attach a verified statement from the professional "setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person

---

[12] The text of section 327 uses the term "trustee" because it is applicable to all chapters of the Bankruptcy Code. However, with certain limitations not applicable to the circumstances at hand, in Chapter 11 proceedings, the debtor in possession has all of the rights, obligations, and duties of a trustee under the Bankruptcy Code.  11 U.S.C. § 1107(a).

employed in the office of the United States trustee." *Id.*  The disclosure requirements of Rule 2014 are intentionally broad and require reporting "any and all connections . . . . Attorneys cannot pick and choose which connections to disclose."  *In re Fretter, Inc.*, 219 B.R. 769, 776 (Bankr. N.D. Ohio 1998) (quoting *In re Nat'l Liquidators, Inc.,* 182 B.R. 186, 196 (S.D. Ohio 1995).  The duty of the trustee's professionals to make Rule 2014 disclosures continues throughout the pendency of the case, requiring them to file subsequent verified statements should new information come to light or a change in circumstances occur.  *In re Metro. Envtl., Inc.*, 293 B.R. 871, 887 (Bankr. N.D. Ohio 2003) ("Although no ongoing disclosure requirement is explicitly set forth in Rule 2014(a), as is the case with Bankruptcy [Rule] 2016(b), case law has uniformly held that under Rule 2014(a), (1) full disclosure is a continuing responsibility, and (2) an attorney is under a duty to promptly notify the court if any potential for conflict arises.").  Indeed, it is commonplace for the trustee's professionals to file amended Rule 2014 statements subsequent to their original disclosures.

In the Supplemental Memorandum, Solar and Arla argue that Kaplan's Rule 2014 disclosures were inadequate because Kaplan "only disclosed its concurrent representation of [Arla] and its representation of various busines interests of [Arla] weeks after the Objection was filed." *Supplemental Memorandum* ¶ 42.  However, Kaplan did not represent Arla in an individual capacity until September 18, 2021, almost two months after Kaplan filed Debtor's bankruptcy petition.  Thus, when Kaplan filed their initial statement, Kaplan's representation of Arla had not yet been established.  Further, Kaplan's attorneys involved in this bankruptcy were unaware of Arla's connection to Solar and disclosed the representation of Arla's business entities once that connection became known.  *See Supplemental Statement* ¶¶ 1-2.

16

As for Kaplan's knowledge of Arla's relationship to Solar, Arla tendered the Fayette Documents as evidence that Kaplan was aware of Arla's involvement with Solar, BWT, and the Debtor well prior to the Petition Date, or, in the very least, soon thereafter. However, Kaplan did not draft or file any of the Fayette Documents other than Kaplan's NOA. The knowledge that Arla was involved in Solar and BWT cannot be implied to Kaplan solely because the Debtor's prior attorneys were aware of this fact. There is no evidence in the record demonstrating *Kaplan's* knowledge of Arla's equity interest in Solar prior to the Petition Date. Arla cites to no precedent which would require, or allow, this Court to find that Kaplan was aware of Arla's role in Solar *through implication* because the Debtor's former officers had that knowledge. In contrast, in the Supplemental Statement, Yeager stated that after filing its initial verified statement, Kaplan "received information suggesting that [Arla] holds equity interests in [Solar]." *Id.* ¶ 1. Kaplan filed the Employment Application on August 30, 2021, more than a month after the Petition Date. As such, the reasonable inference from this evidentiary record is that Kaplan was not aware of Arla's relationship to Solar, BWT, Jennifer Bolus, or the Debtor until sometime after the Petition Date.

In this case, Kaplan made forthright and adequate disclosures in its initial verified statement. At the time Kaplan filed their initial statement, they had not represented Arla as an individual. Moreover, Kaplan's attorneys who are involved in the bankruptcy were unaware of Arla's involvement with Solar. *Supplemental Statement* ¶ 1. After Arla filed the EMPO, Kaplan withdrew the subpoena it issued to Arla. Kaplan filed the Supplemental Statement sixteen days after Arla filed the Objection. Given the circumstances in this case at that time—ongoing, rapid discovery and the motion practice associated with the Objection—this sixteen-day period to draft

17

and file an amended verified statement was reasonable.  Based on all of the facts in evidence, the statements in Kaplan's Supplemental Statement are forthright and correct.

### B.    Conflicts Under Section 327(a)

As described herein above, professionals who seek employment by the trustee must be both "disinterested person[s]" and free of interests adverse to the estate.  Section 101(14) defines the term "disinterested person" as:

a person that—

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).  The first two categories of this definition are not at issue in this case, leaving section 101(14)'s "materially adverse interest" requirement and section 327(a)'s "adverse interest" requirement as the primary legal question at hand.  As numerous courts have held, there is substantial overlap between these two standards.  *See e.g. In re B H & P, Inc.*, 949 F.2d 1300, 1314 (3rd Cir. 1991) ("There is, indisputably, some overlap between the section 327(a) standard and section 101(14)(E) disinterest requirement."); *In re Martin*, 817 F.2d 175, 179 n.4 (1st Cir. 1987) ("'something of a redundancy' exists between sections 101(14) and 327(a)").  In fact, one court has described these tests as "identical."  *Roger J. Au & Son, Inc. v. Aetna Ins. Co.*, 64 B.R. 600, 604 (N.D. Ohio 1986).  For this reason, the Court will treat these two tests as one legal question in this analysis.

18

By now, it is axiomatic that the bankruptcy code does not define the phrase "adverse interest." However, bankruptcy courts have generally accepted the term to mean:

> (1) to possess . . . an economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

*In re Licking River Mining, LLC*, 562 B.R. 351, 357 (Bankr. E.D. Ky. 2016); *In re Greystone Holdings, L.L.C.*, 305 B.R. 456, 461 (Bankr. N.D. Ohio 2003); *In re Fretter*, 219 B.R. at 777; *In re Roberts*, 46 B.R. 815, 826-27 (Bankr. D. Utah 1985), *rev'd in part on other grounds*, 75 B.R. 402 (D. Utah 1987)). Despite this test, courts have struggled to determine whether a potential conflict of interest is sufficient to disqualify a professional from representing the estate. *See e.g.*, *In re Martin*, 817 F.2d at 183 ("[H]orrible imaginings alone cannot be allowed to carry the day. Not every conceivable conflict must result in sending counsel away to lick his wounds."); *In re Leslie Fay Cos.* 175 B.R. 525, 532 (Bankr. S.D.N.Y. 1994) ("[I]nterests are not considered 'adverse' merely because it is possible to conceive a set of circumstances under which they might clash."); *In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998) ("the distinction [between actual and potential conflicts] often seems artificial, and some courts have rejected it"); *In re Relativity Media, LLC*, No. 18-11358 (MEW), 2018 Bankr. LEXIS 2037, at *7 (Bankr. S.D.N.Y. July 6, 2018) ("By its terms, section 327(c) says that representing a creditor is not inherently disabling, unless there is an actual conflict of interest. Other decisions have held that there is no 'actual' conflict of interest under section 327(c) unless there is 'an active competition between two interests, in which one interest can only be served at the expense of the other.'").

Over time, many courts have developed a practical analysis which "elides the distinction [between actual and potential conflicts] and focuses on the concerns of divided loyalties and

affected judgments." *Granite Partners, L.P.*, 219 B.R. at 33. Under this analysis, a "professional has a disabling conflict if it has 'either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors—an incentive sufficient to place those parties at more than acceptable risk—or the reasonable perception of one.'" *Id.* (quoting *In re Martin*, 817 F.2d at 180). Stated somewhat differently, a cognizable, and therefore disqualifying, conflict of interest arises where a professional is subject to "an active competition between two interests, in which one interest can only be served at the expense of the other." *In re Empire State Conglomerates, Inc.*, 546 B.R. 306, 315 (Bankr. S.D.N.Y. 2016) (quoting *In re Diva Jewelry Design, Inc.*, 367 B.R. 463, 472 (Bankr. S.D.N.Y. 2007)). Inquiries into professional conflicts are *ad hoc* by their very nature and, thus, the specific facts of the case at hand are more likely to determine the outcome than any specific legal test. *See, e.g., Leslie Fay Cos.*, 175 B.R. at 532 ("a close review of the cases cited [involving actual or potential conflicts] indicates that the results were largely driven by the facts of each case. And indeed, in the context of section 327, that is precisely the way it should be."); *In re Midway Motor Sales, Inc.*, 355 B.R. 26, 33 (Bankr. N.D. Ohio 2006) ("in conducting [the test of whether the professional holds an adverse interest], the Court should consider the interplay of the parties, pleadings and record set forth in the proceeding"); *In re BH & P, Inc.*, 949 F.2d at 1315 ("Courts have been accorded considerable latitude in using their judgment and discretion in determining whether an actual conflict exists in light of the particular facts of each case.").

Further complicating the conflicts analysis in this case is the exception created under section 327(c) which allows the trustee to retain a professional despite their "employment by or representation of a creditor." 11 U.S.C. § 327(c). This exception applies "unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such

employment if there is an actual conflict of interest." *Id.* The Sixth Circuit has not addressed the application of section 327(c), but some bankruptcy courts in this circuit have taken the position that "[a]n interest adverse to the estate pursuant to section 327(a) is the same as an actual conflict of interest pursuant to section 327(c)." *In re Midway Motor Sales, Inc.*, 355 B.R. at 33; *see also In re Bullitt Utils., Inc.*, 558 B.R. 181, 184-85 (Bankr. W.D. Ky. 2016); *In re M&P Collections, Inc.*, 599 B.R. 7, 11 (Bankr. W.D. Ky. 2019). This analysis harmonizes the standard for conflicts of interest under each of the subsections of section 327 and ensures consistent treatment of all professionals seeking retention by a trustee. Accordingly, this Court will also adopt this analysis.

The foregoing notwithstanding, the Court remains doubtful that Arla has enunciated an actual conflict of interest in the Objection. Arla is but a partial shareholder in Solar, a separate entity that itself has ownership stakes in BWT, the property in dispute in this proceeding. As such, Arla is not a creditor, but merely the interest holder of an entity which is a creditor. Given the degrees of separation between Arla and BWT, and the lack of any real substantive relationship between the individual and the entity, the Court struggles to conceive of a way in which Arla as a client could cause Kaplan to manage Debtor's case differently than they would otherwise. Notably, many of the cases involving a section 327(a) or 327(c) conflict question generally feature a creditor or client so significant that the law firm's judgment in representing the debtor would potentially be influenced by the relationship. *See, e.g.*, *In re Granite Partners, L.P.*, 219 B.R. at 33 (stating "[d]isqualification is appropriate 'if it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation.'" (quoting *In re Leslie Fay Cos., Inc.*, 175 B.R. at 533)); *In re Amdura Corp.*, 121 B.R. 862, 868-69, 871 (Bankr. D. Colo. 1990) (law firm represented major secured creditor and also affiliated debtors: "It appears to the Court … that issues surrounding the Continental Bank

are so pervasive, and the Bank's status as a multimillion-dollar-a-year client of W & S is so significant, that it is difficult, if not impossible, for this Court to reach the conclusion that W & S is 'disinterested.'"); *In re Lee Way Holding Co.*, 100 B.R. 950, 958-59, 961 (Bankr. S.D. Ohio 1989), *modified*, 102 B.R. 616 (S.D. Ohio 1989) (court disqualified debtor's attorney and required the disgorgement of fees paid, for the prepetition and postpetition representation of a major creditor: "[A]t the time the petition was filed … CMH was representing the debtor in negotiating additional terms to a contract that it had been involved with while representing TES, a major creditor of the debtor. … [T]he Court finds that CMH's postpetition representation of TES, purportedly in matters unrelated to this proceeding, to have been in violation of the proscriptions of 11 U.S.C. § 327(c).").   Given the exemption created by § 327(c), it would be highly contradictory to hold that a firm is disqualified from representing the estate solely because of its representation of a shareholder of a creditor.   Instead, such a relationship would need something more to demonstrate that an actual conflict exists between that shareholder of the creditor and the estate.

Above all else, when a bankruptcy court is tasked with considering conflicts of interest, it is crucial for the court to consider that "[t]he purpose behind [§ 327] is to ensure effective represent[ation] of the estates; in other words, it is to ensure that the professional is able to act in the best interest of the estates and can competently and vigorously represent the trustee or debtor-in-possession."  *Century Indem. Co. v. BSA* (*In re BSA*), 630 B.R. 122, 130 (D. Del. 2021); *see also In re Jade Mgmt. Servs.*, 386 F. App'x 145, 148-50 (3d Cir. 2010)).  Notably for the case before this Court, "section 327 does not seek to vindicate the rights of non-debtor entities, and consistent with the plain language of the statute, a court must assess the factual scenario in front of it from the perspective of the estate."  *Century Indem. Co.*, 630 B.R. at 130 (internal citation

omitted).  Accordingly, the primary question for the court to answer is whether the "professional holds or represents interests in competition with the debtor that would actually (as opposed to speculatively) impair its service as an estate fiduciary."  *Id.*

In this case, Kaplan inadvertently engaged in a short-term, non-complex representation of Arla post-petition.  This representation did not involve issues even remotely related to the Debtor, Solar, BWT, or Jennifer Bolus.  Based on the evidence in the record, the Court infers that the information Arla transmitted to Kaplan during this representation had no bearing on this case, the Debtor, BWT, Solar, or Bolus.  There is also no evidence that any such information pertinent to this case was transmitted to Kaplan through its representation of Arla or the entities in which he has an ownership interest.  By expeditiously terminating its relationship with Arla upon realizing the totality of his relationship to the debtor and itself, Kaplan expressly demonstrated its absolute fidelity to the estate.[13]  The act of terminating this relationship removed any scintilla of suspicion that Kaplan had "a meaningful incentive to act contrary to the best interests of the estate" because it effected an explicit indication of the firm's ultimate loyalties.  This conclusion is supported by the dichotomous rulings on this issue, to wit: a professional who attempts to maintain their relationship that would cause an interest adverse to the estate is often disqualified, *see, e.g.*, *In re Granite Partners*, 219 B.R. 22; *Leslie Fay Cos.*, 175 B.R. 525, while, conversely, professionals who have terminated their relationships that would create such adversity have been permitted to work for the estate.  *See, e.g.*, *Century Indem. Co. v. BSA (In re BSA),* 630 B.R. 122; *In re Relativity Media, LLC*, 2018 Bankr. LEXIS 2037.  The termination of Arla resolved both the potential conflict with the estate and the underlying question it created under section 327.

---

[13] A mere five days elapsed between Kaplan's issuance of the subpoena on Arla and its transmission of the Termination Email to him.  This is a reasonable period of time for attorneys to pause and consider the ethical issues at hand before proceeding upon a corrective course.

### C.    Kentucky Supreme Court Rule 3.130(1.7)

As part of the Objection, Arla asserts that as a current client of Kaplan, the firm is prohibited from taking positions adverse to his interests pursuant to Kentucky Supreme Court Rule 3.130(1.7) and, therefore, should be disqualified from representing the Debtor in this case. Arla argues that by representing the Debtor in both the main bankruptcy case and the AP, Kaplan is taking positions that are directly adverse to Arla's personal financial interests as well as the interests of Solar, an entity in which he owns a significant interest. *See* [D.E. 138]. Part and parcel of Arla's argument on this issue is that he was a client of Kaplan's *prior* to the firm's engagement by the Debtor. Arla bases this contention on Kaplan's representation of business entities in which he had a significant stake.

Kaplan responded to the Rule 1.7 arguments by explaining that they never represented Solar and did not represent Arla personally prior to September 18, 2021. *Response to Objection* at 1. The representation of Arla ended naturally, according to Kaplan, after it had completed the legal task he had requested. Kaplan characterizes the engagement as "brief" and "entirely unrelated to" this bankruptcy case. *Id.* at 2. In relation to the information it received from Arla, Kaplan states that "there was never any occasion for [the firm] to acquire any confidential information from [Arla] that would help or harm either the Debtor or [Arla's] respective interests in any conceivable dispute." *Id.* at 3.

All courts have the inherent power to sanction, or disqualify, attorneys who practice before them to ensure "decorum, and . . . the respectability of the profession." *Institutional Labor Advisors v. Allied Res.*, No. 4:12-CV-00044-JHM, 2012 U.S. Dist. LEXIS 203446, at *5 (W.D. Ky. Dec. 5, 2012); *see also Carlsen v. Thomas*, 159 F.R.D. 661, 663 (E.D. Ky. 1994) ("[I]t has long been recognized that federal courts have the inherent power to evaluate the professional

conduct of attorneys practicing before them, and to sanction unprofessional conduct, including disqualification of attorneys."). "A motion to disqualify counsel is the proper method for a party to bring to the Court's attention an alleged conflict of interest by opposing counsel." *Id.* at 4-5. Disqualification of an attorney denies a party of their chosen counsel and, as such, is an extreme sanction which courts generally disfavor. *See Off. Unsecured Creditors Comm. of Valley-Vulcan Mold Co. v. Ampco-Pittsburgh Corp.* (*In re Valley-Vulcan Mold Co.*), 237 B.R. 322, 337, *aff'd* 5 Fed. App'x 396 (6th Cir. 2001) ("Motions to disqualify are viewed with 'disfavor' and disqualification is considered a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'"); *see also Zurich Ins. Co. v. Knotts*, 52 S.W.3d 555, 560 (Ky. 2001) (stating that "disqualification is a drastic measure which courts should be hesitant to impose except when absolutely necessary"). Therefore, courts generally limit disqualification to circumstances "when there is a 'reasonable possibility that some specifically identifiable impropriety' actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice." *SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d 863, 865 (S.D. Ohio 2002). The Sixth Circuit has instructed courts to be cautious when ruling on motions to disqualify counsel because such motions have become a "popular litigation technique" and "a potent weapon." *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988).

Whether an attorney has violated an ethical rule while practicing before a federal court is a matter decided under federal law. *In re Snyder*, 472 U.S. 634, 645 n.6 (1985); *see also Carlsen v. Thomas*, 159 F.R.D at 663 ("The ethical standards by which federal courts measure an attorney's professional conduct are standards defined by federal law."); *Kitchen v. Aristech Chem.*, 769 F. Supp. 254, 258 (S.D. Ohio 1991) ("the Court is guided by federal case law, as well as the American

25

Bar Associations comments to its Model Rules of Professional Conduct and the policies underlying the particular ethical rule at issue."); *Bingham Greenebaum Doll, LLP v. Glenview Healthcare Facility Inc.*, 620 B.R. 582, 592 (6th Cir. BAP 2020) (citing *Marcum v. Scorsone*, 457 S.W.3d 710, 718 (Ky. 2015)).  Although the Western District of Kentucky has not explicitly adopted the Kentucky Rules of Professional conduct, it treats those rules as "persuasive authority, if not governing standards, for practice before this Court."  *Carlsen*, 159 F.R.D. at 664; *Kittel v. C-Plant Fed. Credit Union*, No. 5:09-CV-00114-R, 2010 U.S. Dist. LEXIS 3996, at *4 (W.D. Ky. Jan. 19, 2010); *Greene v. Indep. Pilots Ass'n*, No. 3:14-CV-00628-TBR, 2016 U.S. Dist. LEXIS 160901, at *6-7 (W.D. Ky. Nov. 21, 2016).  Indeed, the Joint Local Rules of Civil Practice for the Eastern and Western Districts of Kentucky empower the federal courts of this state to impose sanctions on attorneys where a violation of the rules of the Kentucky Supreme Court has occurred.  *See* LR 83.3(c); *see also* LR 83.1, 83.2; 6th Cir. R. 46(b).  As such, attorneys practicing in front of the federal courts of the Western District of Kentucky are subject to both the Kentucky Rules of Professional Conduct and the federal canon of ethics derived from precedent.[14]  *See Dirksing v. Safeco Ins. Co. of Illinois*, 544 F. Supp. 3d 767, 770 (E.D. Ky. 2021) ("Motions to disqualify are governed by two sources of authority—local rules of the court hearing the motion and federal common law.").

The party seeking disqualification of opposing counsel carries a particularly heavy burden due to the significant tactical advantage this remedy often creates.  *See Manning*, 849 F.2d at 224; *In re Valley-Vulcan Mold Co.*, 237 B.R. at 337.  Therefore, the moving party must demonstrate an actual conflict of interest has occurred, not merely the appearance, or hint of impropriety.  *Marcum*,

---

[14] The Joint Local Rules apply to the bankruptcy courts of Kentucky because they are "a unit of the District Court." LR 83.12(a).

457 S.W.3d at 718 ("the complaining party should be required to show an actual conflict, not just a vague and possibly deceiving appearance of impropriety."); *see also Bingham*, 620 B.R. at 592. This conflict must "be established with facts, not just vague assertions of discomfort with the representation." *Id.*

When considering a motion to disqualify, a court undertakes a two-step process: (i) determine whether a violation of an ethical rule has occurred; and (ii) assess whether disqualification is the appropriate sanction for that violation. *FDIC v. Commonwealth Land Title Ins. Co.*, No. 1:08-CV-2390, 2012 U.S. Dist. LEXIS 127247, at *10 (N.D. Ohio Sept. 7, 2012). Since disqualification is disfavored, it is not an automatic remedy for an attorney's violation of the ethics rules. *Id.* at 23; *see Little Italy Dev. LCC v. Chi. Title Ins. Co.*, No. 1:11-CV-112, 2011 U.S. Dist. LEXIS 138335, at *26 (N.D. Ohio Dec. 1, 2011). Indeed, the Preamble to the Kentucky Rules of Professional Conduct states:

> Violation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. In addition, violation of a Rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in a pending litigation. . . . [T]he purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule.

Ky. Sup. Ct. Rules, R. 3.130, Rules of Prof. Conduct, Rule 3.130, Preamble § XXI; *see also Greene v. Indep. Pilots Ass'n*, 2016 U.S. Dist. LEXIS 160901, at *10; *Harkins v. House*, 638 S.W.3d 346, 352-53 (Ky. 2021).

At issue in this case is Supreme Court Rule 3.130(1.7) which states:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing. The consultation shall include an explanation of the implications of the common representation and the advantages and risks involved.

Ky. Sup. Ct. R. 3.130(1.7).

The comments to Rule 1.7 provide insight into the purpose and interpretation of this ethical restraint, but do not constitute binding authority. *See Dixie Fuel Co., LLC v. Straight Creek, LLC*, No. 6:08-CV-326-GFVT, 2010 U.S. Dist. LEXIS 150126, at *7 (E.D. Ky. Mar. 25, 2010); *McClain v. Wysong*, No. 3:21-CV-00080-BJB, 2021 U.S. Dist. LEXIS 93694, at *9-10 fn. 4 (W.D. Ky. May 18, 2021). Comment 6 to Rule 1.7 explains the meaning of direct adversity:

> Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent. Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated. The client as to whom the representation is directly adverse is likely to feel betrayed, and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively. In addition, the client on whose behalf the adverse representation is undertaken reasonably may fear that the lawyer will pursue that client's case less effectively out of deference to the other client, i.e., that the representation may be materially limited by the lawyer's interest in retaining the current client. Similarly, a directly adverse conflict may arise when a lawyer is required to cross-examine a client who appears as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client who is represented in the lawsuit.

Ky. Sup. Ct. R. 3.130(1.7) cmt 6.  As such, the drafters of this rule envisioned direct adversity arising where an attorney is required to cross-examine one current client on behalf of another.

In their Supplemental Memorandum, Solar and Arla argue that the facts here are similar to those in *Dixie Fuel Co.*"  *Supplemental Memorandum* ¶ 22.  In *Dixie Fuel Co.*, the court held where a "lawyer must cross-examine a current client on behalf of another current client, a disqualifying conflict arises."  *Dixie Fuel Co.*, 2010 U.S. Dist. LEXIS 150126, at *7.  Solar and Arla argue that direct adversity exists because "[a]s a member of both [BWT] and Solar, [Arla] will be a material witness to the proceedings in the Bankruptcy Case and the [AP]."  *Supplemental Memorandum* ¶ 32.  However, Kaplan has not called Arla as a witness in the current case or the AP.  Where Kaplan may *potentially* call Arla as a witness, this only serves as a *potential* conflict.  This potential conflict would be resolved through the appointment of conflict counsel, as ordered *infra* at 41.

Based on the commentary to Rule 1.7, the Court concludes that a concurrent conflict of interest arose in this case for a short period of time.  When Kaplan issued the subpoena on Arla, he was a client of the firm in his individual capacity.  As such, at the moment Kaplan issued the subpoena, a concurrent conflict of interest arose.

### D.    Disqualification is not Warranted

The determination that a conflict of interest exists does not conclude the analysis.  Instead, the Court must evaluate whether disqualification is an appropriate remedy given the facts of this case.  The Court finds that disqualification is inappropriate for two reasons: first, the circumstances surrounding Kaplan's representation of Arla do not warrant Kaplan's disqualification from this case; and second, Kaplan took ethically appropriate steps to resolve this conflict of interest.

### 1)    Circumstances of Kaplan's Representation of Arla

In recent precedent relating to Rule 1.7, courts have tended to eschew bright line rules requiring disqualification as the automatic outcome from a concurrent conflict of interest. *See, e.g.*, *Gen-Cor, LLC v. Buckeye Corrugated, Inc.*, 111 F. Supp. 2d 1049, 1055 (S.D. Ind. 2000) ("While courts are likely to find a violation of Rule 1.7 and like provisions when a firm represents a party opposing a corporate relation of one of its current clients without consent, such a finding need not result in disqualification, a measure often disfavored by courts."); *Cliffs Sales Co. v. Am. S.S. Co.*, No. 1:07-CV-485, 2007 U.S. Dist. LEXIS 74342, at *15 (N.D. Ohio Oct. 4, 2007) ("There simply is no evidence that CCI or Cliffs has been harmed or prejudiced by Baker's brief concurrent representation of ASC and CCI."); *SWS Fin. Fund A v. Salomon Bros., Inc.*, 790 F. Supp. 1392, 1401 (N.D. Ill. 1992) ("Given the costs imposed by disqualification and the theoretical availability of alternative means of enforcement of the disciplinary code, a court should look to the purposes behind the rule violated in order to determine if disqualification is a desirable sanction."); *Pioneer-Standard Elecs., Inc. v. Cap Gemini Am., Inc.*, No. 1:01-CV-2185, 2002 U.S. Dist. LEXIS 7120, at *11 (N.D. Ohio Mar. 11, 2002) ("There is no reason to believe that Shearman could not pursue both the Cap Gemini litigation and the European Commission matter with equal vigor and without using confidential information to the detriment of either client.").  Instead, these courts reviewed the facts of the case to determine the cause of the conflict of interest and whether that conflict created prejudice for the complaining client.  *See, e.g.*, *SWS Fin. Fund A*, 790 F. Supp. at 1402-03. In conducting this review of the evidence, at least one court employed a three-part test which considers whether (i) the disputed representation will prejudice the complaining client, concentrating on the degree to which the "law firm obtained confidential information from prior representations relevant to the current dispute"; (ii) disqualification would impose significant costs

on the non-moving party or unduly delay the proceedings; and (iii) counsel knowingly created the conflict through their own actions. *S. Visions, LLP v. Red Diamond, Inc.*, 370 F. Supp. 3d 1314, 1337 (N.D. Ala. 2019); *see Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F. Supp. 1121, 1126-27 (N.D. Ohio 1990).

Applying this test to the circumstances of this case, the Court finds that disqualifying Kaplan is not the appropriate sanction. The first factor of this test considers the potential prejudice the client seeking disqualification could suffer if the representation continues. Specifically, this factor is concerned with whether the law firm received confidential information from the complainant which bears upon the current litigation. *See S. Visions, LLP*, 370 F. Supp. at 1337. Indeed, this issue was of the primary factor that many courts considered when rendering a determination on a motion to disqualify due to a concurrent conflict of interest. *See, e.g.*, *Std. Ret. Servs. v. Ky. Bancshares, Inc.*, No. 5:14-026-DCR, 2014 U.S. Dist. LEXIS 136409, at *15 (E.D. Ky. Sep. 24, 2014) ("Without specific information that privileged information relevant to this case was transmitted . . . the Court is unwilling to disqualify counsel based on unsupported allegations."); *Gen-Cor, LLC*, 111 F. Supp. 2d at 1055 (adopting as part of disqualification analysis the focus on whether confidential information had passed through the conflicting representations); *Cliffs Sales Co.*, 2007 U.S. Dist. LEXIS 74342, at *15; *SST Castings, Inc.*, 250 F. Supp. 2d at 870 ("concurrent representation passes muster when the attorney/law firm can represent adverse clients concurrently with equal vigor, without conflict of loyalties and without using confidential information to the detriment of either client"); *SWS Fin. Fund A*, 790 F. Supp. at 1401 (stating that "a court should look to the purposes behind the rule violated in order to determine if disqualification is a desirable sanction" and explaining that Rule 1.7 "serves as a prophylactic to protect confidences that a client may have shared with his or her attorney").

In this case, Arla had not previously been a client of Kaplan and the representation in question was brief. During this representation, Kaplan advised Arla on a corporate formation which was wholly unrelated to the matters in this case. Importantly, Arla did not provide any testimony about the type of confidential information that he communicated to Kaplan nor did he allege that any such information was directly related to this proceeding. Given this lack of evidence, and the nature of the representation, the Court infers that Kaplan did not receive any confidential information that relates to this matter. All told, Arla will not suffer any prejudice from Kaplan's continued representation of the Debtor.

The second factor of this test considers the costs to the party whose counsel would be disqualified and the attendant delay in the proceedings. *S. Visions, LLP*, 370 F. Supp. 3d at 1337. In many ways, this factor mirrors the Sixth Circuit's warning to lower courts to be wary of the weaponization of motions to disqualify by litigants. In this case, the significant costs to the Debtor and the substantial delays in the case that would arise from the disqualification of Kaplan are clear. At the time that Arla filed the Objection, the initial date set for the Evidentiary Hearing was less than a month away. The parties had engaged in significant discovery and pre-trial motion practice related to the Evidentiary Hearing. In fact, they had conducted, or noticed, more than twenty depositions and Rule 2004 examinations. Given the posture of the case, subsequent counsel for the Debtor would have needed significant time to review the case and prepare for the Evidentiary Hearing. This would have come at a considerable cost, and created a marked delay in the case, given the volume of information new counsel would need to review. Here, as in other cases where a court has refused to disqualify counsel, the Debtor is "an innocent in this matter who should not be subjected to such a draconian sanction." *Garland v. Ford Motor Co.*, No. 2:12-00121, 2015 U.S. Dist. LEXIS 38505, at *23 (M.D. Tenn. Mar. 26, 2015) (the court denied a motion to

disqualify based entirely on the prejudice that the non-moving party would have suffered from the loss of its counsel, despite a clear Rule 1.7 violation); *see also Moses v. Sterling Commerce (Am.), Inc.*, 122 F. App'x 177, 183 (6th Cir. 2005) (appeals court affirmed denial of motion to disqualify counsel, stressing that "[c]ourts must be vigilant in reviewing motions to disqualify counsel[,] as 'the ability to deny one's opponent the services of capable counsel[ ] is a potent weapon' . . . that can be 'misused as a technique of harassment.'" (quoting *Kitchen*, 769 F. Supp. at 256-57)); *Manning*, 849 F.2d at 224 (the appeals court remanded a district court decision disqualifying a law firm, agreeing that the "harsh remedy of disqualifying the entire law firm was not warranted" absent further proceedings); *Poole v. Lowe's Home Ctrs., LLC*, No. 3:14-cv-01884, 2016 U.S. Dist. LEXIS 170783, at *10-11 (M.D. Tenn. Dec. 9, 2016) (the court denied a motion to disqualify counsel, finding "[d]isqualification of counsel at a late stage of proceedings, after discovery has occurred and trial set, is a particularly 'draconian sanction.' (quoting *Garland*, 2015 U.S. Dist. LEXIS 38505 at *10-11)); *Grain v. Trinity Health*, 431 F. App'x 434, 445 (6th Cir. 2011) (appeals court found that the district court did not abuse its discretion in declining to disqualify defense counsel, finding no "reasonable possibility that some specifically identifiable impropriety actually occurred" (quoting *Moses*, 122 F. App'x at 183-84)).

The third and final factor of this test considers whether the lawyer who is the subject of the disqualification motion took steps to create the concurrent conflict or was surprised by its development. *S. Visions, LLP*, 370 F. Supp. 3d at 1337. A primary consideration of this factor is whether the lawyer undertook the concurrent conflict knowingly. *See Gould, Inc.*, 738 F. Supp. at 1127; *S. Visions, LLP*, 370 F. Supp. at 1337. As found earlier, the evidence in the record indicates that Kaplan was unaware of the impending conflict of interest when it agreed to represent Arla. *Supplemental Statement* ¶ 1. Solar's primary evidence that Kaplan had knowledge of the conflict

is the Fayette Documents. The Fayette Documents may demonstrate that Debtor had knowledge that Arla was a part-owner of Solar, but it is Kaplan's knowledge of the conflict that is important in this analysis. There is no evidence in the record to demonstrate that *Kaplan* was aware of Arla's relationship to Solar. All three factors weigh against disqualifying Kaplan from representation of the Debtor.

### 2)    Kaplan Took Appropriate Steps to Resolve the Conflict

Arla contends that when Kaplan terminated their attorney-client relationship, the firm acted in an unethical manner while also failing to cure the underlying conflict of interest. To support this contention, Arla points to the so-called "Hot Potato" rule which prevents a law firm from terminating a client relationship in order to alleviate a concurrent conflict of interest. The oft-quoted explanation of the Hot Potato rule states that "courts universally hold that a law firm will not be allowed to drop a client in order to resolve a direct conflict of interest, thereby turning a present client into a former client." *Garland*, 2015 U.S. Dist. LEXIS 38505, at *16.

At first blush, this rule seems to be a uniformly accepted, all encompassing, bright line ethics restriction that prevents a lawyer from ever terminating a client to resolve a concurrent conflict of interest. This regrettably broad language belies a relatively narrow application of the rule to specific factual circumstances.[15]  In most cases where courts apply the Hot Potato rule, the following elements are present: (i) the law firm is aware of the concurrent conflict before, or at least at the time, it arises; and (ii) the clients are pre-existing at the same law firm, or have arrived

---

[15] A more succinct and accurate description of the Hot Potato rule states that "a law firm that knowingly undertakes adverse concurrent representation may not avoid disqualification by withdrawing from the representation of the less favored client before hearing." *Miesen v. Hawley Troxell Ennis & Hawley LLP*, No. 1:10-cv-00404-DCN, 2018 U.S. Dist. LEXIS 43799, at *23 (D. Idaho Mar. 16, 2018). This definition of the Hot Potato rule makes clear that the law firm must act with knowledge of the conflict of interest when it agrees to accept the offending representation.

at the same firm as the result of lawyers changing firm affiliations, at the time that the conflict of interest arises. *See In re Chardon, LLC*, 536 B.R. 791 (Bankr. N.D. Ill. 2015) (conflict arose when former NW&A attorneys joined Much Shelist because opposing party had been a client of that firm); *Garland*, 2015 U.S. Dist. LEXIS 38505 (conflict arose when attorneys who previously worked for law firm Walker Tipps joined Butler Snow, where Garland was client with Walker Tipps and opposing party Ford was client with Butler Snow); *Markham Concepts, Inc. v. Hasbro, Inc.*, 196 F. Supp. 3d 345 (D.R.I. 2016) (conflict arose when attorneys from law firm Cadwalader joined law firm GT, where plaintiff Markham was a client of Cadwalader and GT had represented Hasbro); *Hartford Acc. and Indem. Co. v. RJR Nabisco, Inc.*, 721 F. Supp. 534 (S.D.N.Y. 1989) (attorney had continuing attorney-client relationship with defendant when he joined law firm LeBoeuf, where LeBrouf then took on representation of plaintiff in this case); *Picker Int'l, Inc. v. Varian Assocs., Inc.*, 670 F. Supp. 1363 (N.D. Ohio 1987), aff'd 869 F.2d 578 (Fed. Cir. 1989) (conflict arose when law firm MH&S merged with Jones Day where Varian had been represented by MH&S over past twenty years, including five on-going matters, and opposing party Picker was major client of Jones Day); *Harte Biltmore Ltd. v. First Pennsylvania Bank, N.A.*, 655 F. Supp. 419 (S.D. Fla. 1987) (conflict developed as a result of merger between two law firms, where one was representing defendant in current case and plaintiff was a client of other firm); *Altova GmbH v. Syncro Soft SRL*, 320 F. Supp. 3d 314 (D. Mass. 2018) (law firm represented both clients for six years before conflict between the two arose); *In re Relativity Media, LLC*, 2018 Bankr. LEXIS 2037 (Netflix was a current client with Winston & Strawn and the disputes between Netflix and Relativity were known to the firm at the time of hiring by Relativity); *Krutzfeldt Ranch, LLC v. Pinnacle Bank*, 272 P.3d 635 (Mont. 2012) (Hoskins failed to adequately withdraw representation from Krutzfeldt when firm merged with Crowley, where Crowley represented opposing party

Pinnacle Bank in present case); *Metro. Life Ins. Co. v. Guardian Life Ins. Co.*, No. 06 C 5812, 2009 U.S. Dist. LEXIS 42475 (N.D. Ill. May 18, 2009) (law firm Winston was representing Metlife in three projects when Winston agreed to represent Guardian in this case); *El Camino Res., Ltd. v. Huntington Nat. Bank*, 623 F. Supp. 2d 863 (W.D. Mich. 2007) (Pepper Hamilton was present counsel for Bank Midwest in nine ongoing actions over past two years and counsel for ePlus over six years when Pepper Hamilton agreed to undertake representation of Huntington National Bank to oppose claims of Bank Midwest and ePlus in this case); *In re Mercury*, 280 B.R. 35 (Bankr. S.D.N.Y. 2002) (debtor was client of Fellows for several years and was represented by Fellows in current case when Fellows withdrew representation to instead act as special counsel to the Trustee); *Santacroce v. Neff*, 134 F. Supp. 2d 366 (D.N.J. 2001) (law firm represented Santacroce over the course of two years before firing her to represent Neff in current case); *Int'l Longshoremen's Ass'n Local 1332 v. Int'l Longshoremen's Ass'n*, 909 F. Supp. 287 (E.D. Pa. 1995) (plaintiff was client of defense counsel in other matters when counsel then took on representation of defendant); *Pulsecard, Inc. v. Discover Card Servs.*, No. 94-2304-EEO, 1994 U.S. Dist. LEXIS 19635 (D. Kan. Dec. 29, 1994) (law firm M&H represented Pulsecard in multiple transactions when M&H withdrew their representation in present suit to work for opposing party); *Florida Ins. Guar. Ass'n, Inc. v. Carey Canada, Inc.*, 749 F. Supp. 255 (S.D. Fla. 1990) (firm represented the separate parties for over a decade when the concurrent conflict between the two clients arose).  When either of these elements are present, application of the Hot Potato rule is a viable imposition of ethical restrictions.

However, when either or both elements are absent, as is the situation in this case, this rule actually prevents lawyers from taking ethically appropriate steps to resolve a conflict.  As explained earlier, the evidence in the record demonstrates that Kaplan was unaware of the conflict

of interest when it agreed to represent Arla.  This lack of knowledge meant that Kaplan could not avoid the conflict prior to accepting Arla as a client.  Standing alone, this fact distinguishes this case from most, if not all, of the Hot Potato precedent.  Inadvertently entering into a concurrent conflict of interest is entirely different than, and should be juxtaposed against, a law firm's knowing creation of such a conflict.

Furthermore, in the majority of cases in which courts have applied the Hot Potato rule, both clients have had a preexisting, long-term relationship with the firm in question.  As such, the firm had a duty of loyalty to each client before the conflict of interest arose between the clients.  In such a scenario, the purpose of the Hot Potato rule word—"to protect and reinforce the duty of loyalty an attorney has to an existing client"—is clearly implicated.  *Miesen*, 2018 U.S. Dist. LEXIS 43799, at *23.   In this case, however, the Debtor and Arla are *successive clients,* not contemporaneous. The facts demonstrate that Kaplan agreed to represent the Debtor first.  Moreover, at the time Kaplan agreed to represent Arla, it had been representing the Debtor in this proceeding for over a month.  During that period, Kaplan, acting on the Debtor's behalf, had already taken a number of steps that Arla claims are adverse to his interests.  In fact, the parties agree that the purpose of the bankruptcy filing was for the Debtor to regain control over BWT, a goal that Arla believes to be adverse to his financial interests.  Based on this timeline of events, it is clear that Kaplan's duty of loyalty in this circumstance was to the Debtor, and the circumstances that Arla points to as adverse to his interests existed *prior* to his retention of the firm.[16]   In

---

[16] Section 327 does not address when a lawyer's duty of loyalty to their client begins, and, as such, leaves the underlying state ethics rules on that issue unmodified.  Therefore, an attorney's duty of loyalty to a client who intends to file a Chapter 11 bankruptcy begins when the lawyer agrees to take the case.

summation, the facts of this case do not fit neatly into the limited circumstances where the Hot Potato rule could apply.

Since Arla entered into an attorney-client relationship with Kaplan after the Debtor, terminating Arla was an ethically appropriate response to the concurrent conflict. The comments to Rule 1.7 provide that, in certain circumstances, termination of a client is a viable means to resolve a concurrent conflict of interest. Comment 4 to Rule 1.7 states:

> If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b). See Rule 1.16. Where more than one client is involved, whether the lawyer may continue to represent any of the clients is determined both by the lawyer's ability to comply with duties owed to the former client and by the lawyer's ability to represent adequately the remaining client or clients, given the lawyer's duties to the former client. See Rule 1.9.

Ky. Sup. Ct. R. 3.130(1.7) cmt 4. In Formal Opinion 92-367, titled Lawyer Examining a Client as an Adverse Witness, or Conducting Third Party Discovery of the Client, the American Bar Association addressed the circumstances presented in this case. In this Formal Opinion, the ABA explained "that the Model Code forbade a lawyer's accepting representation adverse to an *existing client* even in an unrelated matter. This stricture is clearly set out in Rule 1.7(a)." ABA Formal Op. 92-367 at 3 (emphasis added). The phrase "existing client" elucidates Comment 4 to Rule 1.7 by defining which client takes precedence in terms of the duty of loyalty. Stated succinctly, the pre-existing client is the party to whom the attorney owes the duty of loyalty and against whose interests adversity is judged. Addressing the appropriate method to resolve the conflict the ABA stated that:

> Where one of the two representations is prospective only, and conflict is clearly foreseeable, then the solution, absent client consent, is clear enough: the prospective engagement must be declined. The solution may not be so simple,

38

however, in a case where the conflict arises, or becomes foreseeable, only after both representations are well under way. *Withdrawal from representation is an obvious possibility; but the harder question is, from which representation?  Priority in time of the commencement of the representation is ordinarily likely to be given primary weight*, yet the balance of equities, in terms of prejudice resulting from withdrawal, may well tilt strongly the other way.

Formal Op. 92-367 at 7 (emphasis added). So, an attorney would normally withdraw from the representation that is later in time absent significant prejudice to that client.

In this case, Arla became a client of Kaplan nearly two months after the Debtor.  He was a client of the firm for a short time and the representation was limited to the formation of a corporate entity.  The record is devoid of any facts that would demonstrate Arla would be prejudiced by Kaplan's withdrawal.  In contrast, the Debtor would be significantly prejudiced if Kaplan was disqualified or forced to withdraw given the significant, complex, and enduring litigation involved in this proceeding.  As such, the only practical, ethical solution to this conflict of interest was for Kaplan to withdraw from its representation of Arla.

Arla argues that his attorney-client relationship with Kaplan preceded that of the Debtor. He bases this argument on Kaplan's representation of a number of corporate entities in which he holds a substantial ownership stake.  However, the record reflects that in the Engagement Letter for these representations, Kaplan explained that "[o]ur client in this matter will be the Company and, by extension, the members, but not each of the members in an individual capacity." *Engagement Letter* at 1.  Arla acknowledges this limiting language, but counters that "in negotiations and in receiving advice, I always felt I was being advised…." *Second Arla Aff.* ¶ 8. This position is antithetical to Sixth Circuit precedent which holds that "[t]he law is generally settled that an attorney for a corporation does not automatically represent the corporation's constituents in their individual capacities, even on the same matters.  There must be clear consent."

*Innes v. Howell Corp.*, 76 F.3d 702, 712 (6th Cir. 1996). *Cf. Dixie Fuel Co.*, 2010 U.S. Dist. LEXIS 150126, at *16 ("While representing an individual does not necessarily extend to representation of that individual's entity (and vice versa), the duty to clarify relationships and straighten client expectations falls on the lawyer.").[17]  Without clear evidence that Kaplan agreed to represent Arla personally prior to July 29, 2021, he cannot demonstrate that he is the prior client. In these factual circumstances, Kaplan acted appropriately in withdrawing from its representation of Arla.

The court finds no present conflict of interest, and if it is not already apparent, had the Court been called upon to apply Kentucky Supreme Court Rule 3.130(1.9)—"Duties to Former Clients"—to the underlying set of facts, the Court would have found no former client conflict either.  The text of Rule 1.9 reads as follows:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

> (b) A lawyer shall not knowingly represent a person in the *same or a substantially related matter* in which a firm with which the lawyer formerly was associated had previously represented a client

> > (1) whose interests are materially adverse to that person; and

> > (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

---

[17] In *Dixie Fuel Co.*, the law firm Frost Brown Todd LLC ("FBT"), counsel for defendant Harlan Development Corp. ("Harlan"), had a disqualifying conflict of interest against Dixie Fuel Co. member Joe Bennett.  2010 U.S. Dist. LEXIS 150126.  FBT represented the Bennett family *personally* in estate planning, including Joe Bennett, and represented closely held entities owned by the Bennett family for *years before* Harlan brought an action against Dixie Fuel Co. *Id.*  Even though it was questionable whether FBT ever represented Dixie Fuel Co., the court determined that the Bennetts "[held] a colorable subjective expectation that FBT would not be adverse to a Bennett entity" because of FBT's history of representing the Bennett family personally *and* entities owned by them.  *Id.* at *16.  This is consistent with this Court's determination.  Here, Kaplan clearly demarcated that it only represented Arla's entities.  Further, Kaplan does not have a history of representing Arla personally, related or unrelated to his entity ownerships.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

Ky. Sup. Ct. R. 3.130(1.9) (emphasis added).  As the evidence demonstrates, Arla was never represented by Kaplan in the "same or a substantially related matter."  Nor is there a former client conflict according to the standard test adopted by this circuit; the Sixth Circuit has adopted *Dana*'s three-part test for disqualification: (1) a past attorney-client relationship must have existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the subject matter of those relationships was/is substantially related; and (3) the attorney acquired confidential information from the party seeking disqualification.  *Dana Corp. v. Blue Cross & Blue Shield Mut.*, 900 F.2d 882, 889 (6th Cir. 1990).  Again, the subject matter of Kaplan's relationships to Arla and to the Debtor were clearly never "substantially related," and because the second element of the *Dana* test is not met, the analysis ends.  In short, the Court finds Rule 1.9 and *Dana* inapplicable to the circumstances.

### E.    Kaplan Must Retain Conflict Counsel and Take Other Appropriate Measures

The foregoing notwithstanding, the Court will require Kaplan to hire conflicts counsel to handle any matters where Arla is involved.  Furthermore, to the extent that Kaplan has not yet done so, it shall erect an ethical screen between the lawyers who represented Arla personally and any lawyer in the firm who represents, or may represent, the Debtor.  For all these reasons, the Court **OVERRULES** Solar and Arla's Objection, [D.E. 138].

41

Charles R. Merrill
United States Bankruptcy Judge

Dated: May 18, 2022