**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| | ) | Chapter 11 |
| CURARE LABORATORY LLC | ) | |
| | ) | |
| Debtor | ) | Case No. 21-31588 |
| | ) | |

---

**MEMORANDUM OPINION**

---

This matter is before the Court on the *Debtor's Expedited Motion to Remove Custodian and Restore Possession, Custody, and Control to Debtor* (the "Custodian Removal Motion"), [D.E. 3], filed by Curare Laboratory LLC ("Curare," or the "Debtor"), the *Joint Motion to Dismiss Pursuant to 11 U.S.C. § 1112* (the "Dismissal Motion"), [D.E. 171], filed by Bluewater Toxicology, LLC ("Bluewater"), Solar Holdings Group, LLC ("Solar"), and Jennifer Bolus ("Bolus") (together, the "Bluewater Parties"), and the *Motion for Summary Judgment as to Debtor's Motion to Restore* ("Summary Judgment Motion"), [D.E. 181], filed by the Bluewater Parties. For the reasons set forth below, the Court **GRANTS** the Bluewater Parties' Dismissal Motion without prejudice to refiling.

I.    **FACTS AND PROCEDURAL HISTORY**

**Background:** This case arises out of a dispute over the majority ownership interest in Bluewater, a medical testing and diagnostics company that has realized significant revenue in recent years due to the high demand for its COVID-19 testing services. As detailed more fully below, Curare maintains that it holds an 80% ownership interest in Bluewater pursuant to a Securities Purchase Agreement ("Sale Agreement") which the Debtor entered into with Solar in

September of 2017. The Bluewater Parties counter that Curare failed to effectuate this 80% purchase of Bluewater because Curare immediately defaulted on the Sale Agreement. In response to this alleged default, Solar and Bolus filed a state court lawsuit ("State Court Litigation") against Curare in December 2017 in an effort to restore its control of Bluewater and hold Curare accountable for its alleged default and related misconduct.

According to the Bluewater Parties, the State Court Litigation resulted in the appointment of a monitor over Bluewater and Curare, the restoration of control over Bluewater back to Solar and its principal, Bolus, and a divestment of Curare's operations of Bluewater. As a result, the Bluewater Parties have filed the Dismissal Motion seeking to dismiss the bankruptcy, or to have this Court abstain[1], on grounds that Curare no longer has any ownership or control over Bluewater pursuant to the state court orders, and accordingly has no basis for relief. Curare counters that, because the state court orders are interim, non-final orders that remain subject to further proceedings, Curare still maintains ownership and control over Bluewater, and seeks to have the state court-appointed monitor removed.

Additionally, the Bluewater Parties seek dismissal on grounds that Curare's newly-appointed manager, Tyler Burke ("Burke"), was never properly appointed as the LLC's manager, a process which required an 85% majority vote by its members under the express terms of Curare's operating agreement. Since the parties do not dispute that no such vote ever took place, the Bluewater Parties contend that Burke lacked the managerial authority to put the Debtor in bankruptcy, warranting dismissal of the case. Curare counters that the inclusion of any 85% majority vote provision in a subsequent version of the operating agreement was inadvertent, that

---

[1] The Bluewater Parties have raised arguments in favor of mandatory abstention, permissive abstention, and abstention based on the *Rooker-Feldman* Doctrine, discussed further below.

Curare did effectuate a change in managerial authority by having its former manager, Kevin Liske ("Liske"), name Burke as the newly-appointed manager[2], and that Solar and Bolus, as creditors of the Debtor, lack standing to challenge the terms of Debtor's operating agreement. Curare concludes that, as a result of that managerial change, Burke did in fact have the power to file bankruptcy under the controlling operating agreement. In February of 2022, the Court conducted a three-day evidentiary hearing[3] ("Evidentiary Hearing") on the Custodian Removal Motion, Dismissal Motion, and the Summary Judgment Motion, as discussed in more detail below.

**Curare Formation and Sale Agreement (July 2017)**: Originally formed in 2013, Bluewater is a medical diagnostics company located in Mt. Washington, Kentucky, that provides laboratory services in the form of specimen collection, testing, and diagnostic services. Feb. 16 Tr. 23:10-12, 23:20-24:5. Solar, also formed in 2013, is a holding company co-owned by Bolus and Dr. Praveen Arla ("Arla") which was created to hold Bluewater shares. Feb. 16 Tr. 21:19-22:3. Besides its shares in Bluewater, Solar has no other assets. Feb. 16 Tr. 22:4-6. Solar initially held 95% of Bluewater's membership interests along with two other minority partners. Feb. 16 Tr. 23:13-19; 29:19-25. However, in July 2017, Bolus was approached by Charles "Junior" Johnson ("Johnson") regarding the potential sale of Bluewater, and ultimately agreed to proceed with a purchase transaction with Johnson. Feb. 16 Tr. 26:22-24; 27:10-19; 29:1-6.

Shortly thereafter, on or about August 10, 2017, Curare was formed to be a toxicology lab that would partner with and purchase membership interests in Bluewater from Solar. *See* Feb. 15

---

[2] As explained further below, Liske sold his membership interest in JJSquared, Curare's largest equity holder, to Laboratory Investment Company, LLC, an entity co-owned by Burke, and in conjunction with that sale, Liske attempted to appoint Burke as Curare's new manager.

[3] The evidentiary hearing was transcribed resulting in three transcripts: February 15 Transcript ("Feb. 15 Tr."), February 16 Transcript ("Feb. 16 Tr."), and February 24 Transcript ("Feb. 24 Tr."). *See* [D.E. 262, 263, 273].

Tr. 74:18-20. Contemporaneously, four additional, related companies were also created: (1) Curare Telehealth, LLC ("Telehealth"), a mobile telemedical company; (2) Curare Management, LLC ("Management"); (3) Curare Medical; and (4) Kentucky Telehealth ("KYTH"), a holding company. Feb. 15 Tr. 73:19-74:17; Feb. 16 Tr. 117:15-118:3; 119:7-11. Bolus is the president, CEO, and 100% owner of KYTH, which in turn owns 20% of Telehealth. Feb. 16 Tr. 117:15-25; 118:1-13. Bolus is also the president and CEO of Telehealth, which owns 20% of the Debtor. Feb. 16 Tr. 160:20-25.

On or about September 5, 2017, shortly after its formation, Curare entered into a Sale Agreement with Solar, [D.E. 137-1], to purchase 80% interest in Bluewater from Solar for an aggregate purchase price of $4,000,000.[4] In conjunction with the Sale Agreement, Curare paid Solar $250,000 at closing[5] and executed a Term Promissory Note ("Note"), [D.E. 137-2], in favor of Solar and Bolus in the original principal amount of $3,750,000 for the remaining balance. The Note was secured by a contemporaneous Pledge Agreement, [D.E. 248-15], that Curare executed in favor of Solar which granted Solar a first lien over all of Bluewater's property and assets as collateral securing Curare's payment due under the Note. The Note was secured by a Security Agreement executed by Bluewater in favor of Solar, [D.E. 248-16], which granted Solar a security interest in all Bluewater's business assets and inventory. As part of the sale transaction, Bolus (through KYTH) received a 20% ownership interest in Telehealth, was named president of

---

[4] The acquisition was an owner-financed transaction with $250,000 paid down on the purchase price and the remaining $3.75 million to be paid over time and memorialized via the Note dated September 5, 2017. The Note's terms required monthly payments—the "greater of (i) the sum of 25% of Bluewater's cash flow for the immediately preceding month for cash flow up to $100,000.00, plus 50% of the cash flow for any month in excess of $100,000, or (ii) $25,000 . . . ."—beginning October 31, 2017, and an additional payment of $250,000 on or before January 2, 2018. [D.E. 137-1 at 2].

[5] To facilitate the purchase and obtain the down payment of $250,000, Curare borrowed the money from Wally Langley ("Langley"), a member and creditor of Curare, and executed a promissory note, [D.E. 211-46] in favor of Langley. Feb. 15 Tr. 221:10-13.

Telehealth, and executed an employment contract with Telehealth.  Feb. 16 Tr. 7:3-13; Feb. 15 Tr. 90:3-17.  Additionally, Curare agreed to contract with Bolus' former associate, Mick Tarullo ("Tarullo"), as a consultant.  [D.E. 3 ¶ 14].

**Curare Operating Agreements (Sept.-Oct. 2017):**  As part of Curare's formation and subsequent acquisition of shares in Bluewater, various operating agreements were drafted for Curare, Telehealth, Management, and Bluewater.  Feb. 16 Tr. 97:12-23.  Ultimately, the shareholders had three different versions of Curare's operating agreement drafted, and the parties disagree as to which of the three agreements is controlling.  [D.E. 171 at 3-4].  Each of the three operating agreements provides that Curare shall be "manager managed."  [D.E. 248-1 at 4], [D.E. 248-2 at 4], [D.E. 248-3 at 2].  Furthermore, each of the three versions identifies Liske as Debtor's manager.  *See, e.g.*, [D.E. 248-1 at 13].

However, there are key differences among the three operating agreements.  The first operating agreement ("Operating Agreement A"), [D.E. 248-1], is undated and signed only by Liske.  The second operating agreement ("Operating Agreement B"), [D.E. 248-2], has some terms which vary slightly from Operating Agreement A and was executed by Liske and Langley on September 1, 2017.  Curare's third operating agreement ("Operating Agreement C"), [D.E. 248-3, 248-4, 248-5, 248-6, 248-7, 248-8, 248-9, and 248-10], was separately executed by eight of Curare's members between September 5, 2017 and October 23, 2017.[6]  According to the signing members' ownership percentages, the Bluewater Parties calculate that at least 78% (and 80% if

---

[6] The following eight members signed Operating Agreement C: JJSquared, LLC ("JJSquared") (45% ownership interest); Langley (14.62% ownership interest), who also signed Operating Agreement B; BC Management, LLC (5.625% ownership interest); BC Management 2, LLC (5.625% ownership interest); Larry Hancock (3.375% ownership interest); the Rodney L. Conrad Living Trust (2.25% ownership interest); Steve Geisler ("Geisler") (1.125% ownership interest); and Olga Group, LLC (who may own a 2% ownership interest but is not identified on Curare's list of Equity Security Holders, [D.E. 248-11]).

counting Olga Group, LLC) of Curare's members executed Operating Agreement C. [D.E. 171 at 3-4]. The Bluewater Parties contend that Operating Agreement C controls because it is signed by the majority of Curare's members.

Notably, only Operating Agreement C contains the following provision requiring a meeting of Curare's members and an 85% super majority vote in order to effectuate the election of a new manager:

> **4.1 MANAGEMENT OF THE BUSINESS**: This Company shall be manager managed. The initial elected manager is set forth in the articles of organization filed with the appropriate State agency. … Managers listed in the articles of organization and/or elected under this agreement will serve as the Managers of this Company until a meeting of members is held and *new Manager(s) elected with a super majority of 85% required to make the change*.

[D.E. 248-3 at 2-3] (emphasis added). Further, Operating Agreement C makes clear that members "shall not take part in the operation of the Company's affairs," and that the manager alone "is authorized by Members to make all decisions as to … the management of all or any part of the Company's assets" and "the employment of persons, firms or corporations for the operation and management of the Company's business." [D.E. 248-3 at 3].

Based on the terms of Curare's operating agreement, the Bluewater Parties now argue that Curare lacked the authority to file bankruptcy, because Operating Agreement C clearly only permitted the LLC's manager to make such decisions. The Bluewater Parties explain that, although Liske attempted to appoint Burke as Curare's new manager, thereby authorizing Burke to file bankruptcy, Burke lacked the authority to do so because the mandatory vote by the LLC members required to appoint a new manager never took place.

**Alleged Misrepresentations and Default (Sept.-Dec. 2017):** In connection with the Sale Agreement, Bluewater provided certain representations and warranties regarding the business and

6

sale transaction with Curare.  [D.E. 137-1 at 4-15].  Curare alleges that, shortly after the transaction closed, it learned that many of Bluewater's representations and warranties were inaccurate, Feb. 15 Tr. 94:8-15, causing Curare to cease payments and eventually leading to the Bluewater Parties' notice of default and subsequent State Court Litigation against Curare.

Curare's Custodian Removal Motion alleges that the Sale Agreement with Solar contained various representations and warranties which ultimately proved to be exaggerated or untrue, such as misrepresentations regarding Bluewater's financial condition and inflated revenue, patterns of overbilling and audited claims, and large clients terminating their contracts with Bluewater. [D.E. 3 ¶¶ 15-19]; Feb. 15 Tr. 94:8-15; 94:22-95:2; 96:8-18.  Curare also learned of an investigation into Bluewater's billing and coding practices by the Department of Justice which resulted in Bluewater's paying $1.5 million settlement.  [D.E. 137-12].

Due to these alleged misrepresentations and discoveries, on November 29, 2017, Curare sent a default letter via email, [D.E. 211-2], notifying Solar and Bolus that, based on its internal investigation of the legal and financial issues surrounding the Sale Agreement, Curare would cease making payments on the Note.  Where the Note required monthly payments of at least $25,000 beginning October 2017, and Curare had only made one such monthly payment prior to its internal investigation and cessation of payments, on December 7, 2017, Solar responded by sending Curare its own Notice of Default.  [D.E. 211-3].  The Bluewater Parties allege that, while defaulting on its payments, Curare also siphoned significant amounts of money from Bluewater, denied Bolus and Solar access to Bluewater's accounts, opened a competing laboratory[7], and ultimately put

---

[7] According to Bluewater, in December 2017, Johnson informed Bolus of Curare's intent to open a competing laboratory in Lexington, Kentucky. called Apollo Laboratory.  Apollo Laboratory Science and Technology Services, LLC ("Apollo"), a then-defunct LLC, was reinstated with the Kentucky Secretary of State on October 12, 2017. Langley, an employee of Curare, serves as Apollo's Statutory Agent and Manager.  Additionally, Johnson informed

Bluewater's business in jeopardy. [D.E. 16 at 5]. This breakdown between Curare and Solar eventually led to the underlying State Court Litigation in Fayette Circuit Court.

**State Court Litigation (Dec. 2017):** On or about December 15, 2017, Solar and Bolus initiated a lawsuit[8] against Curare and other individuals associated with Curare in Fayette Circuit Court[9]. In their verified first amended complaint, Solar and Bolus alleged that Curare breached the Sale Agreement where it only paid $25,000 as its October 2017 payment, and failed to make its November 2017 payment, and was therefore in default on the Note. [D.E. 248-17]. Additionally, on December 21, 2017, Solar filed a Motion for Appointment of Receiver for Bluewater ("Receiver Motion"), which was not immediately ruled upon. [D.E. 3 ¶ 32].

Contemporaneously with the initiation of the State Court Litigation, Solar and Bolus also filed an Ex Parte Motion for Temporary Restraining Order, asserting that Curare was not paying creditors, stealing money and assets, stealing employees and customers, and failing to conduct internal audits at Bluewater. [D.E. 3 ¶ 30]. In response, on December 22, 2017, the Fayette Circuit Court issued an Ex Parte Temporary Restraining Order ("TRO"), [D.E. 248-18], requiring Curare and the other named defendants to (1) pay Bluewater's creditors, including Solar and Bolus; (2) leave, preserve, and maintain all assets of Bluewater; (3) cease solicitation of Bluewater's

---

Bolus that Bluewater's equipment (the collateral for the Note) was to be moved to the competing Apollo facility and that Bluewater employees would likewise be working for the competing Apollo Laboratory. [D.E. 16 at 5].

[8] The Fayette Circuit Court (4th Division) case is styled *Solar Holdings Group, LLC and Jennifer Bolus v. Curare Laboratory, LLC, Charles E. Johnson, Jr. aka Junior Johnson, Kevin Liske, Larry Hancock, Dustin Dixon and Bluewater Laboratory, LLC*, case no. 17-CI-4443.

[9] Curare's Custodian Removal Motion attests that the State Court Litigation was initiated as a result of Curare's November 29, 2017, correspondence to Solar and Bolus outlining Solar's various breaches of the Sale Agreement and the termination of Tarullo as Curare's consultant.

employees or customers; (4) cease siphoning and redirecting proceeds and income of Bluewater to Debtor and the other Defendants; and (5) complete an internal audit.

Curare then filed a Motion to Dissolve and/or Modify the TRO, prompting the state court to hold a hearing on the TRO. After hearing testimony from both sides, on January 9, 2018, the court converted the TRO to a temporary injunction ("Injunction"), [D.E. 248-19], and on March 22, 2018, entered an order enforcing the Injunction ("Injunction Order"). [D.E. 248-20]. The state court's Injunction Order found that "Plaintiffs have shown irreparable harm, including, but not limited to, the imminent destruction of Bluewater as a going concern" and that "Plaintiffs have also shown a likelihood of success on the merits." [D.E. 248-20 at 3]. The Injunction Order added that "[a] receiver or court monitor is being appointed to act in the best interest of all parties pursuant to separate order, and it appears the parties are in agreement for this appointment." [D.E. 248-20 at 4].

On March 12, 2018, Solar filed a Motion to take Possession of Accounts and other Collateral. [D.E. 3 ¶ 33]. On March 15, 2018, Curare filed its Answer and Counterclaim asserting breach of contract, fraud, recission and unjust enrichment, based upon the alleged misrepresentations and warranties in the Sale Agreement as well as improper payments to employees and Bluewater's improper employment of Tarullo as a consultant. [D.E. 3 ¶ 34]. Curare's Answer and Counterclaim sought compensatory and punitive damages against Solar and Bolus as well as payment of attorneys' fees. [D.E. 3 ¶ 34]. On April 23, 2018, Curare filed its Amended Answer, Counterclaim, and Third-Party Complaint, asserting its original claims but also adding Tarullo as a third-party defendant. [D.E. 3 ¶ 35].

On May 23, 2018, the Fayette Circuit Court entered an Order Appointing Custodian/Monitor ("Custodial Order"), [D.E. 248-21], to oversee and monitor the financial and

9

business matters of Bluewater, and appointed Calvin Cranfill ("Cranfill" or "Monitor") from Lexington, Kentucky, as a limited receiver to function as Bluewater's custodian. On July 3, 2018, Solar filed a Motion to take Possession, Custody and Control of all Bluewater Assets, Accounts, and Property Based on Abandonment (the "Possession Motion"). [D.E. 3 ¶ 37].

On July 17, 2018, the Monitor issued his report ("Cranfill Report"), [D.E. 248-22], reflecting that over $1.6 million was lost or diverted from Bluewater by Curare and the other named defendants. The following day, on July 18, 2018, Curare and the other defendants filed a Notice of Filing ("Handback"), [D.E. 248-23], in the Fayette Circuit Court matter documenting that Curare had filed a "Bluewater handback" to Solar.

On July 30, 2018, the Fayette Circuit Court entered its order transferring possession, custody and control of Bluewater assets, accounts, and property back to Solar and Bolus ("Divestment Order"), [D.E. 248-24], "pending adjudication on the merits of this case and the final resolution thereof." Curare explains that, because the state court has made no final adjudication on the merits on Curare's complaint and counterclaims, Curare has lacked access to Bluewater since 2018. [D.E. 3 ¶ 39].

During 2018 there was a great deal of activity in the Fayette Circuit case, however, thereafter, it lay dormant for nearly a year and a half. Eventually, in early 2020, the Fayette Circuit Court issued an order indicating that it would dismiss the case for lack of prosecution if the parties took no further action. [D.E. 3 ¶ 40]. The case remained dormant with no activity other than administrative and procedural matters regarding the change of counsel, until July 19, 2021, when Solar and Bolus filed their motion for summary judgment against Curare shortly after Curare was reinstated with the Kentucky Secretary of State. [D.E. 3 ¶¶ 41-42].

10

**Attempted Sale to Burke and Sturgeon (Jan. 2019):**  Curare argues that, while the State Court Litigation was pending, and after Curare had obtained its 80% ownership interest in Bluewater, Solar and Bolus subsequently promised an additional 66.6% of Bluewater shares to Burke and Bobby Sturgeon ("Sturgeon"), two parties who were at the time unrelated to Curare. [D.E. 3 ¶¶ 7, 44-45]; Feb. 16 Tr. 68:6-15.  In January or February of 2019, Bolus and Bluewater allegedly engaged in discussions with Sturgeon and Burke to become partners and co-owners in two additional businesses.  [D.E. 3 ¶ 43]; Feb. 16 Tr. 68:6-15.

Ultimately, however, Bolus and Solar were unable to effectuate the transfer of interests to Burke and Sturgeon due to Curare's potential 80% ownership of Bluewater.  [D.E. 3 ¶ 45].  Due to the inability to convey shares, Bolus, Sturgeon, Burke, and Brian Mack ("Mack") formed a new company: United States Medical Laboratory Limited Liability Company ("US Med Lab").  [D.E. 3 ¶ 46].  Aided by a $1 million line of credit guarantied by Sturgeon, Burke, and Mack, US Med Lab was intended to work in conjunction with Bluewater, [D.E. 3 ¶ 47], but the entity ultimately failed and its equipment and assets were moved into Bluewater.  [D.E. 3 ¶ 48].  Sturgeon and Burke began working as independent contractors for Bluewater in the interim while they continued to await their membership interests in the company.  [D.E. 3 ¶ 49].  Although Sturgeon and Burke were named "managing partners" of Bluewater, Curare alleges its membership in Bluewater remained at an undisputed 80% ownership interest.  [D.E. 3 ¶ 49].  According to Curare, Sturgeon and Burke were responsible for generating the significant sales and revenue for Bluewater, which grew from under $1 million to around $20 million as of the close of 2019.  [D.E. 3 ¶ 50].  Sturgeon, Burke, and Curare ultimately received no distributions from the increased revenue.  [D.E. 3 ¶ 51]. Although Bolus and Solar allegedly attempted to sell the same majority interest in Bluewater twice,

Curare, Sturgeon, and Burke (the apparent majority interest owners) have not received any financial information or distributions since 2017. [D.E. 3 ¶ 52].

**Management Change (July 2021):**  As activity in the State Court Litigation resumed in 2021, Curare's ownership also changed hands around this time.  Curare is a manager-managed LLC, and under the express terms of all versions of Curare's operating agreement, Liske was Curare's undisputed original manager.  [D.E. 248-1 at 13], [D.E. 248-2 at 13], [D.E. 248-3 at 6].  Liske was also the sole member of JJSquared, the largest equity security holder (45% ownership) in Curare.  [D.E. 171 at 2].  On July 26, 2021, Liske sold his membership interest in JJSquared to Laboratory Investment Company, LLC ("LIC"), an entity owned by Burke and two other individuals, for $500.  [D.E. 171 at 2]; Feb. 15 Tr. 114:4-11.  In conjunction with the sale of his membership interest in JJSquared, Liske appointed Burke (through LIC, successor owner of JJSquared) as Curare's new manager responsible for controlling all of Debtor's operations.  [D.E. 211-51].

Three days later, on July 29, 2021, Burke signed a document entitled "Resolution of the Manager of Curare Laboratory LLC," [D.E. 211-52], reflecting that as Curare's new manager, Burke had authority to direct Curare to file bankruptcy and to retain bankruptcy counsel on behalf of the Debtor.  Shortly thereafter, Burke filed Chapter 11 bankruptcy petition on Curare's behalf without any meeting or member vote, believing he had succeeded Liske as manager and had managerial authority to make such decisions.  Feb. 16 Tr. 247:6-12; 314:10-13.

Because Curare is a manager-managed LLC, the change in ownership was intended to effectively change the company's management, and more specifically, who was authorized to file bankruptcy on behalf of the LLC.  However, as the Bluewater Parties argue, under the express terms of the Debtor's Operating Agreement C, a new manager to replace Liske could only be

12

elected by a super majority vote of 85% of Curare's members, but no member meeting was held to elect a successor manager or to vote on the filing of a bankruptcy petition.  [D.E. 171 at 2]. Accordingly, the Bluewater Parties seek dismissal of the bankruptcy on grounds that Burke was never properly appointed as the Debtor's new manager since the operating agreement's express instructions for voting for and appointing a new manager were not followed.

**Curare Files Bankruptcy (July-Oct. 2021)**:  On July 29, 2021 (the "Petition Date"), the Debtor filed the underlying Chapter 11 petition for bankruptcy relief, hiring Kaplan Johnson Abate & Bird LLP ("Kaplan") as its attorneys for the Chapter 11 proceeding.  Curare explains that it lacked sufficient funds to pay its creditors without the recovery of its Bluewater-related assets from Solar and Bolus, Curare filed the Chapter 11 petition in order to restore the possession, custody, and control of its assets.  [D.E. 3 ¶¶ 53-54].  Immediately after the initiation of this Chapter 11 proceeding, Curare filed the Custodian Removal Motion, [D.E. 3], and both Bluewater and Solar/Bolus filed objections thereto, [D.E. 16, 18], and then filed the Dismissal Motion, [D.E. 171], and Summary Judgment Motion, [D.E. 181], arguing among other things that Burke lacked authority to file bankruptcy, that the Court should abstain from hearing Curare's motion under 28 U.S.C. § 1334, and that the *Rooker-Feldman* Doctrine bars Curare and this Court from attacking the Fayette Circuit Court's orders.  The Court subsequently set the Evidentiary Hearing on those matters for November 3-4, 2021.[10]   On October 18, 2021, Curare also initiated an adversary

---

[10] The evidentiary hearing was rescheduled to February 15-16, 2022, [D.E. 232], to allow the parties to attempt to mediate the dispute in January, which proved unsuccessful.  A third day of testimony was held on February 24, 2022.

proceeding against Solar, Bluewater, and Bolus (the "AP")[11], and filed an accompanying Motion for Injunctive Relief to prevent the alleged continuing dissipation of assets by the defendants.[12]

**Evidentiary Hearing (Feb. 2022):**    At the Court's three-day Evidentiary Hearing in February 2022, the Court heard witness testimony from: (1) Liske, Curare's former managing member; (2) Geisler, Bluewater's former employee and member of Curare; (3) Langley, creditor and member of Curare; (4) Bolus, an interested party and member of Solar; (5) Burke, Curare's managing member; (6) Gregory Ingle; (7) Daniel Post; and (8) Arla, an interested party and member of Solar.   More specifically, the Court heard evidence and testimony regarding: (1) whether Burke lacked corporate authority to commence the bankruptcy on Curare's behalf; (2) whether mandatory and discretionary abstention are appropriate; (3) whether the *Rooker-Feldman* doctrine prohibits Curare's attacks on the Fayette Circuit Court's divestment order; (4) whether Curare seeks to compel turnover of property that is not property of the estate and not in the Custodian's possession; and (5) whether the factors favoring dismissal under § 1112(b)[13] are present.

The Court heard testimony from Liske, Curare's original manager, who speculated that although eight members of the Debtor signed Operating Agreement C, thereby agreeing to the added provision requiring an 85% super majority vote to appoint a new manager, they likely did so inadvertently.  Feb. 15 Tr. 80:24-81:7.  Liske testified that he considers Operating Agreement B, which contains Liske's wet signature, the controlling version of Curare's three operating

---

[11] *See Curare Laboratory LLC v. Solar Holdings Group, LLC, Bluewater Toxicology, LLC, and Jennifer Bolus,* Adversary Proceeding 21-03025.

[12] The adversary complaint is still awaiting a ruling from the Court, pending the resolution of the underlying issues in the main bankruptcy case, which will be instructive to the outcome of the AP.

[13] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

agreements, and explained that, although he did electronically sign Operating Agreement C, he did so inadvertently, not realizing the terms related to Curare's managerial control had changed:

> Q     Okay.  And which is the operable document for Curare Laboratory as far as these operating agreements are concerned?
>
> A     From my perspective, it was the hand signed document.
>
> Q     Okay.  And why is it the hand signed document from your perspective?
>
> A     That one was the original document created for the laboratory.  I think where the confusion lies was that we had two very similar documents with respect to the operating agreement, the first one, the hand signed one where it gave the manager absolute control was used for entities like Curare Laboratory.  We had investors that we had brought along from other entities and we wanted to make sure that as the manager, we could control how that business conducted itself.
>
> And in the confusion lies where when we were cleaning up the shareholder book, and they were sending out the agreements for everybody to sign, inadvertently they chose the wrong version of the document and I inadvertently signed this not recognizing that that specific language related to control had been changed so I made an error when I signed the document, the intent was and the expectation was that the document that I was E-signing was actually the document that I had previously hand signed.
>
> Q     Okay.  And as your, in your role as manager of Curare Laboratory, what was your understanding of your authority for Curare Laboratory?
>
> A     That I had complete control.
>
> Q     Okay.  And could you appoint a new manager if you wanted to?
>
> A     I'm sorry, yes.

Feb. 16 Tr. 80:11-25; 81:1-14.  Despite their conflicting testimony regarding which operating agreement is controlling, Liske, Langley, Burke, Geisler, and Bolus all testified that no meetings of Curare's members ever took place, including in 2021 when Liske attempted to appoint Burke as Curare's new manager.  Feb. 15 Tr. 192:21-25; 209:19-22; 211:19-21; 239:22-24; 243:11-13; 244:3-5, Feb. 16 Tr. 134:5-16; 263:7-12.

Regarding the Telehealth operating agreement, and its impact on Bolus's ability to vote against Curare's attempted managerial change by Liske and Burke, the Court heard the following

15

colloquy between Bolus and counsel for Curare during Bolus's redirect examination, clarifying that Bolus never attempted to initiate a vote as to Burke's appointment as Curare's new manager or Burke's subsequent decision to file the underlying bankruptcy:

Q        Are you a member of Curare Laboratory, LLC?

A        No.

Q        Okay.  Have you ever been a member of Curare Laboratory, LLC?

A        No.

Q        And then you testified earlier that you are a member of Curare Telehealth, correct?

A        Correct.

Q        And what's your percentage ownership in Curare Telehealth?

A        20 percent.

Q        Okay.  And you also testified that you're the manager of Curare Telehealth, correct?

A        Correct.

Q        And how many managers are there on the Board of Managers of Curare Telehealth?

A        Three.

Q        And who are the other two?

A        Junior Johnson and Kevin Liske.

Q        Okay.  And you stated in court today that you objected to the actions of Tyler Burke on behalf of Curare Telehealth, correct?

A        Correct.

Q        And is it your opinion that under that operating agreement, you could do that without the Board of Managers?

A        I haven't -- I have not read the Curare Telehealth operating agreement in probably four years.

Q        Okay.  And you have 20 percent of Curare Telehealth, correct?

A        Correct.

Q        Okay.  And then Curare Telehealth has 20 percent of Curare Laboratory, correct?

A     Correct.

Q     Okay. And we just said there's three people on the Board of Managers. You're one of those three, correct?

A     Correct.

. . .

Q     Okay. And is this the Curare Telehealth operating agreement that you were talking about?

A     It is.

Q     Okay. And if you go to the third page of it, under management, it talks about the Board of Managers, do you see that?

A     Yes.

Q     All right. And that's what we were just talking about if you look at that second paragraph under the Board of Managers, it says to three, and you said that was Junior Johnson, I believe yourself and Mr. Dixon?

A     No, Kevin Liske.

Q     I'm sorry, Kevin Liske, right. And then it says on the next page, the second full paragraph, "The Board of Managers shall, at all times, act by the majority vote thereof with each member entitled to cast one vote on each matter", do you see that?

A     You're -- the second paragraph?

Q     Paragraph -- on page four on the second full paragraph, the first sentence, okay? Was there a vote by the Board of Managers of Curare Telehealth with respect to whether or not to oppose Tyler Burke as a manager?

A     No. Considering the circumstances with my relationship with Junior Johnson and Kevin Liske, I don't think I'll be successfully having a meeting with them.

Q     I understand. Was there a vote taken on whether or not to oppose the bankruptcy filed by Curare Laboratory?

A     No.

Feb. 16 Tr. 193:11-194:20; 201:1-202:3. The Court permitted the parties to file post-trial briefs,

[D.E. 284, 285], before taking the matter under submission.

## II.    STANDARD OF REVIEW

The question of whether "cause" exists to dismiss a Chapter 11 proceeding is a matter entrusted to the sound discretion of the bankruptcy court which determines this issue on a case-by-case basis. *Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F.3d 127, 131 (6th Cir. 1995) (citing *Laguna Assocs. Ltd. P'ship. v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd. P'ship)*, 30 F.3d 734, 737 (6th Cir. 1994). The Bluewater Parties, as movants, bear the burden of proof on their Dismissal Motion by the preponderance of the evidence. *See In re Player Wire Wheels, Ltd.*, 421 B.R. 864, 868 (Bankr. N.D. Ohio 2009); *see also Bal Harbour Club, Inc. v. AVA Dev., Inc.* (*In re Bal Harbour Club, Inc.*), 316 F.3d 1192, 1195 (11th Cir. 2003).

## III.    LEGAL ANALYSIS

In the Dismissal Motion, the Bluewater Parties assert that the filing for bankruptcy was improper as grounds for dismissal. The Bluewater Parties contend that under Curare's Operating Agreement and Kentucky Limited Liability Act, KRS 275.001 et seq. ("Kentucky LLC Act"), Burke was improperly appointed as manager of Curare and therefore was without authority to file bankruptcy on behalf of Curare. [D.E. 171 at 8-9]. In its Post-Trial Brief, the Debtor counters that the Bluewater Parties do not have standing to challenge matters of intra-company governance or interpretation of the Operating Agreement; Liske's appointment of a successor manager was a proper delegation of management authority under KRS 275.165(3); and Liske's execution of the Manager's Resolution was an act within his apparent authority to act as manager of Curare. [D.E. 285 at 23-26]. The Court must decide (1) whether the Bluewater Parties have standing to challenge the bankruptcy filing; (2) who has authority to file bankruptcy on behalf of an LLC; and finally (3) whether Burke falls within the authority to file bankruptcy on behalf of Curare.

1.    *Standing to Challenge Bankruptcy Filing*

Debtor contends that the Bluewater Parties do not have standing to challenge what is in the Curare Operating Agreements because none of the Bluewater Parties are a party to the Operating Agreement.  [D.E. 207 at 13-14].  The Bluewater Parties argue that creditors have standing to challenge the authority to file a bankruptcy case.  [D.E. 284 at 14].

The Bluewater Parties' argument is grounded in section 1109(b) of the Bankruptcy Code. Section 1109(b) states:

> **[a] party in interest, including** the debtor, the trustee, a creditors' committee, an equity security holders' committee, **a creditor**, an equity security holder, or any indenture trustee **may raise and may appear and be heard on any issue in a case under this chapter**.

11 U.S.C. § 1109(b) (emphasis added).  Several courts have found this section to mean that "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains, thus making explicit what is implicit in an in rem proceeding—that everyone with a claim to the res has a right to be heard before the res is disposed of since that disposition will extinguish all such claims."  *In re Alma Energy LLC*, No. 07-70370, 2007 WL 4163640, at *1 (Bankr. E.D. Ky. Nov. 20, 2007) (quoting *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992)); *see Nintendo Co., Ltd. v. Patten (In re Alpex Comput. Corp.)*, 71 F.3d 353, 356 (10th Cir. 1995) (party in interest "is generally understood to include all persons whose pecuniary interests are, [sic] directly affected by the bankruptcy proceedings"); *In re E.S. Bankest, L.C.*, 321 B.R. 590, 594 (Bankr. S.D. Fla. 2005) (same); *In re Orchard at Hansen Park, LLC*, 347 B.R. 822, 825 (Bankr. N.D. Tex 2006) (same).

Section 1109(b) uses broad language, allowing creditors whose legally-protected interests may be affected by the bankruptcy to challenge "any issue in a case," including debtor's authority

to file bankruptcy. *See* 11 U.S.C. § 1109(b); *In re Flagstaff Foodservice Corp.*, 29 B.R. 215, 218 (Bankr. S.D.N.Y. 1983) ("Section 1109(b) must be construed broadly to permit parties affected by a Chapter 11 case to appear and be heard." (citing 5 Collier on Bankruptcy (15th Ed.))); *In re Lexington Hosp. Grp., LLC*, 577 B.R. 676 (Bankr. E.D. KY 2017) (creditor challenged debtor's authority to file pursuant to its Operating Agreement); *Matter of Giggles Rest., Inc.*, 103 B.R. 549, 556 (Bankr. D.N.J. 1989) ("BKC [creditor] has a stake in an adjudication that the resolution authorizing bankruptcy was invalid and that the petition should be dismissed."); *In re Memphis-Friday's Assocs.*, 88 B.R. 821, 827 (Bankr. W.D. Tenn. 1988) (creditor of debtor had standing under section 1109(b) as a party in interest to contest the validity of the filing).

Further, courts have found that creditors may also have standing under section 1112(b) to dismiss a bankruptcy case on grounds that filing was improper. *See, e.g., In re Orchard*, 347 B.R. at 827; *In re Abijoe Realty Corp.*, 943 F.2d 121 (1st Cir. 1991). Section 1112(b)(1) provides:

> Except as provided in paragraph (2) and subsection (c), **on request of a party in interest, and after notice and a hearing, the court shall** convert a case under this chapter to a case under chapter 7 or **dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause** unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphasis added). Similar to analysis under section 1109(b), courts have considered whether a creditor has sufficient stake in the case to determine whether a creditor has standing under section 1112(b) has standing to seek dismissal. *In re Orchard*, 347 B.R. at 825; *see In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130, 138 (Bankr. D. Me. 1991)

Here, Bluewater itself may not have standing to bring the Motion to Dismiss, but Solar and Bolus each do have standing under either section 1109(b) or 1112(b) because they are creditors. Both Bolus and Solar are creditors of Curare through the Note and Security Agreement created as

part of the transaction in which Curare purchased 80% of Bluewater. As such, the court finds that the Bluewater Parties have a sufficient stake in the case to have standing.

    2.   *Authority to File Bankruptcy*

A company's authority to file bankruptcy is controlled by state law. *In re Lexington Hosp. Grp.*, 577 B.R. at 682; *In re East End Dev., LLC*, 491 B.R. 633, 638 (Bankr. E.D.N.Y. 2013); *In re D & W Ltd., LLC*, 467 B.R. 427, 432 (Bankr. E.D. Mich. 2012); *In re ComScape Telecomms., Inc.*, 423 B.R. 816, 830 (Bankr. S.D. Ohio 2010). "The burden of demonstrating cause for dismissal for lack of authority to file is on the movant." *In re Lexington Hosp. Grp.*, 577 B.R. at 682-83 (citing *In re Oregon Homes, LLC*, No. 13-33349, 2015 WL 4794861, at *2 (Bankr. N.D. Ohio Sept. 25, 2014)).

Under its Articles of Organization, Curare is organized as a Kentucky limited liability company. Operating Agreement C states that "[t]he Members hereby form a Limited Liability Company ("Curare Laboratory LLC") subject to the provisions of Kentucky state law as currently in effect as of this date." The Kentucky LLC Act "provides that an operating agreement governs the parties' conduct, unless the statute requires otherwise." *In re Lexington Hosp. Grp.*, 577 B.R. at 683; *see, e.g.,* KRS 275.005, 275.165, 275.175.

While Curare has multiple versions of its Operating Agreement, below the Court will address the reasons that Operating Agreement C controls in this matter. All Operating Agreements contain provision "4.1 MANAGEMENT OF THE BUSINESS," which states that the company is manager managed. All Operating Agreements also contain provision "4.3 POWERS OF MANAGERS", detailing a non-exhaustive list of actions the manager is authorized to take. None of the Operating Agreements have any provision specifying how the company would file for bankruptcy.

Default provisions of the Kentucky LLC Act control where the operating agreement is silent. *Racing Inv. Fund 2000 v. Clay Ward Agency, Inc.*, 320 S.W.3d 654, 657 (Ky. 2010). Section 275.165 of the Kentucky LLC Act outlines the manager's power to manage the business and affairs of the company:

> (1) Unless the articles of organization vest management of the limited liability company in a manager or managers, management of the business and affairs of the limited liability company shall vest in the members.  Subject to any provisions in the articles of organization, the operating agreement or this chapter restricting or enlarging the management rights and duties of any person or group or class of persons, the members shall have the right and authority to manage the affairs of the limited liability company and to make all decisions with respect thereto.
>
> (2) If the articles of organization vest management of the limited liability company in one (1) or more managers, except to the extent otherwise provided in the articles of organization, the operating agreement, or this chapter, *the manager or managers shall have exclusive power to manage the business and affairs of the limited liability company.*  Unless otherwise provided in the articles of organization or the operating agreement, managers:
>
>> (a) Shall be designated, appointed, elected, removed, or replaced by a vote, approval, or consent of the majority-in-interest of the members;
>> (b) Shall not be required to be members of the limited liability company or natural persons; and
>> (c) Unless they are sooner removed or sooner resign, shall hold office until their successors shall have been elected and qualified.
>
> (3) Unless otherwise set forth in a written operating agreement, a member or manager of a limited liability company has the power and authority to delegate to one (1) or more other persons the member's or manager's powers to manage or control the business and affairs of the limited liability company, including without limitation the power to delegate to agents and employees of a member, manager, or limited liability company or to delegate by an agreement to other persons.  This delegation by a member or manager of a limited liability company shall not cause the member or manager to cease to be a member or manager of the limited liability company.

KRS 275.165 (emphasis added).  Kentucky courts have interpreted the Kentucky LLC Act to vest managers with broad authority, including the ability to file for bankruptcy on the company's behalf. *See, e.g., In re Lexington Hosp. Grp.*, 577 B.R. at 686-88 ("The manager's authority under the [Kentucky LLC Act] is not limited to day-to-day operations or the ordinary course of business.

Filing bankruptcy may be outside the ordinary court, but it is a business decision and is connected to the business affairs of the Company.").

The Operating Agreement and Kentucky LLC Act confer broad authority to the company manager, with no express provision in the Operating Agreement limiting the manager's ability to file bankruptcy for the company. Thus, the manager of Curare has authority to file bankruptcy on the company's behalf.

### 3. *Burke's Appointment as Curare Manager*

Finally, this Court must determine whether Liske's appointment of Burke as manager of Curare was valid under the terms of the Operating Agreement. The Bluewater Parties assert that Liske's attempt to appoint Burke as Curare's new manager was invalid because the Operating Agreement requires an 85% vote by the LLC members to elect a new manager, which never took place. [D.E. 171 at 8-9].

The Kentucky LLC Act states that "[u]nless otherwise provided in the articles of organization or the operating agreement, managers [s]hall be designated, appointed, elected, removed, or replaced by a vote, approval, or consent of the majority-in-interest of the members." KRS. 275.165(2)(a). Here, there are three Operating Agreements submitted to the record, two of which have different provisions concerning the appointment of a new manager. Operating Agreement A is signed only by Liske and is not dated. Operating Agreement B is signed by Liske and Langley, dated September 1, 2017. Operating Agreement C was again signed by Liske and Langley, as well as seven other members of Curare, consisting of about 80% of Curare's total membership interests.

The Kentucky LLC Act contains no requirements for adopting an initial operating agreement. *See generally* KRS 275.001 et seq.; *Racing Inv. Fund 2000*, 320 S.W.3d at 654 ("If

the members of a particular LLC do not adopt a written operating agreement or adopt one which is silent on certain matters, Ky. Rev. Stat. Ann. ch. 275 contains default provisions that will govern the conduct of the entity's business and affairs."). Proving that a particular writing or agreement is the operating agreement "is a matter of general contract law." UK/CLE Limited Liability Companies in Kentucky § 7.1.1. Parties to a contract may modify the terms of their agreement, and where the terms of a later agreement contradict the earlier agreement, the terms of the later agreement supersede those of the earlier contract. 17A Am. Jur. 2d Contracts § 489; *In re Gatlinburg Motel Enters.*, 127 B.R. 814, 819 (Bankr. E.D. Tenn. 1991) ("The ordinary rule in contractual matters is that the last agreement as to the same subject matter which is signed by all parties supersedes all former agreements and the last contract is the one which embodies the true agreement. Upon execution by the parties of a valid and legal substituted agreement, the original agreement merges into it and is extinguished."). Here, because the parties to the earlier operating agreements signed the later Operating Agreement C, and Operating Agreement C is executed by the majority of Curare's members, Operating Agreement C controls.

Operating Agreement C contains the following provision requiring a meeting of Curare's members and an 85% super majority vote to elect a new manager:

> **4.1 MANAGEMENT OF THE BUSINESS**: This Company shall be manager managed. The initial elected manager is set forth in the articles of organization filed with the appropriate State agency. . . . Managers listed in the articles of organization and/or elected under this agreement will serve as the Managers of this Company *until a meeting of members is held and new Manager(s) elected with a super majority of 85% required to make the change*.

Operating Agreement C at 2-3 (emphasis added). Operating Agreement C also contains provisions that members "shall not take part in the operation of the Company's affairs," and that the manager "is authorized by Members to make all decisions as to . . . the management of all or any part of the Company's assets" and "the employment of persons, firms or corporations for the operation and

24

management of the Company's business." Operating Agreement C at 3. As discussed above, these provisions allow the manager to file bankruptcy, but also restrict members from filing for bankruptcy.

When interpreting a contract, a court first looks to its language, and, if the intent is apparent from its face, there is no room for construction. 17A Am. Jur. 2d Contracts § 340 ("Courts are not at liberty to infer intent contrary to that emanating from the text at issue." (citing *Gibbs v. Moody*, 180 So. 3d 830 (Miss. Ct. App. 2015)); *Frontier Energy, LLC v. Aurora Energy, Ltd.* (*In re Aurora Oil & Gas Corp.*), 460 B.R. 470, 480 (Bankr. W.D. Mich. 2011) ("The over-arching purpose of contract interpretation is to determine the parties' intent at the time of contracting."); *In re 5877 Poplar, L.P.*, 268 B.R. 140, 147 (Bankr. W.D. Tenn. 2001) ("Courts must interpret contracts as written, even where its terms seem harsh or unjust absent proof of fraud or mistake." (citing *Gray v. Estate of Gray*, 993 S.W.2d 59, 64 (Tenn. Ct. App. 1998))). The express language in Operating Agreement C requires a meeting and an 85% super-majority vote to elect a new manager. The parties agree that no meeting or vote ever took place. Curare is a manager managed LLC and under the express terms of all versions of Curare's operating agreements, Liske is Curare's undisputed original manager. Liske attempted to appoint Burke as Curare's new manager when Liske sold his membership interest to JJSquared, memorialized in a document executed by Liske and Burke on July 26, 2021. *See* [D.E. 211-51]. However, this document fails to appoint a new manager, because it is in contravention to Curare's Operating Agreement which requires the 85% super-majority vote. Burke was therefore improperly appointed as manager and is without authority to file bankruptcy on Curare's behalf.

The Bluewater Parties state that the July 26, 2021 document serves as Liske's resignation, and Debtor is currently without a manager. [D.E. 171 at 7]. However, this document memorializes

Liske's transfer of membership shares of JJSquared, and to any extent that Liske is no longer a member of a shareholder of Curare, neither the Operating Agreement nor the Kentucky LLC Act require a member to be manager.  *See* Operating Agreement C; KRS 275.165(2)(b) ("managers [s]hall not be required to be members of the limited liability company or natural persons").  The July 26 document also states "Manager Kevin Liske, in order to ensure the continued uninterrupted operation of [Curare], hereby executes this instrument appointing his successor member of JJSquared, LLC, a shareholder of common stock of Company, as Manager . . . ."  Any purported resignation by Liske is conditioned upon appointing a successor manager "to ensure the continued uninterrupted operation of [Curare]."  The Court does not interpret this document to express a separate resignation of Liske, leaving Curare without a manager.  Rather, the failed attempt to appoint JJSquared as the new manager signifies that Liske is still manager of Curare.

Debtors counter that Liske's appointment of a successor manager was an appropriate delegation of managerial authority under the Kentucky LLC Act, and that it can be inferred that the bankruptcy filing has been ratified by the members of the Debtor since no member has maintained a challenge to Burke's authority to manage Debtor.  Section 275.165(3) provides:

> Unless otherwise set forth in a written operating agreement, a member or manager of a limited liability company has the power and authority to delegate to one (1) or more other persons the member's or manager's powers to manage or control the business and affairs of the limited liability company, including without limitation the power to delegate to agents and employees of a member, manager, or limited liability company or to delegate by an agreement to other persons. This delegation by a member or manager of a limited liability company shall not cause the member or manager to cease to be a member or manager of the limited liability company.

KRS 275.165(3).  While Liske may have the power to delegate managerial authority, that is not what the July 26 document purported to do.  Liske's intent was to transfer his membership shares and appoint a new manager, not merely to delegate managerial authority while still acting as manager of Curare.  Further, Debtor cites to *In re Avalon Hotel Partners, LLC* for the proposition

that a bankruptcy filing can be ratified post-petition. 302 B.R. 377 (Bankr. D. Or. 2003). However, in *In re Avalon Hotel Partners, LLC*, the post-petition ratification was executed *per the terms of the company's operating agreement*, requiring an approval in excess of 75% of the members. Here, again, no such vote took place as required by the operating agreement, either before or after the bankruptcy filing. Debtor's filing is not ratified.

Debtors also counter that "Liske's execution of Manager's Resolution was an act within his apparent authority to act as manager of the Debtor, and [LIC] (successor member of JJSquared) and its representative, Tyler Burke, reasonably believed that Liske was authorized to take such actions." [D.E. 285 at 25]. The Kentucky LLC Act speaks to apparent authority of managers or members:

> Every manager shall be an agent of the limited liability company for the purpose of its business or affairs, and the act of any manager, including, but not limited to, the execution in the name of the limited liability company of any instrument, for apparently carrying on in the usual way the business or affairs of the limited liability company of which he is the manager shall bind the limited liability company, unless the manager so acting has, in fact, no authority to act for the limited liability company in the particular matter, and *the person with whom the manager is dealing has knowledge or has received notification of the fact that the manager has no such authority.*

KRS 275.135(2)(b) (emphasis added). Under general agency law, "*a principal is affected with constructive knowledge, regardless of his actual knowledge, of all material facts* of which the agent received notice or acquired knowledge while acting in the course of his employment and within the apparent scope of his authority, even though the agent may fail to inform his principal thereof." *Martin v. Provident Life & Acc. Ins. Co.*, 47 S.W.2d 524, 526 (Ky. 1932) (emphasis added); *see Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 594 (Ky. 2012) ("An agent is said to have apparent authority to enter transactions on his or her principal's behalf with a third party when the principal has manifested to the third party that the agent is so authorized, and the third

party reasonably relies on that manifestation").  Constructive knowledge is imputed to a principal if the principal "has knowledge of such facts as would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry, and he fails to do so, he is chargeable with the knowledge which by ordinary diligence he would have acquired."  *Bennett v. Nicholas*, 250 S.W.3d 673, 677 (Ky. 2007) (quoting *Mitchell v. First Nat'l Bank of Hopkinsville*, 263 S.W. 15, 17 (1924).

Liske, as the manager and therefore agent of Curare, either received notice or acquired knowledge when executing Operating Agreement C that he could not unilaterally appoint a successor manager.  Here, Burke did not reasonably believe that Liske was authorized to appoint Burke as the new manager, as Burke had constructive knowledge of the Operating Agreement and its management provisions.  Becoming new manager of a company, a reasonable person would have done their due diligence in reviewing, amongst other things, the Articles of Incorporation and Operating Agreements.  Liske thus had neither actual authority nor apparent authority when appointing Burke as the new manager.

Because Burke is without authority to file bankruptcy on Debtor's behalf, this Court is without jurisdiction.  *See Price v. Gurney*, 324 U.S. 100, 106 (1945) ("If the District Court finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition.").

The other legal rationales for dismissal of this case advanced by the Bluewater parties, including but not limited to mandatory and permissive abstention and application of the *Rooker-Feldman* doctrine, are generally unavailing.  However, this Court reserves these issues, along with the questions presented by the Custodian Removal Motion, for thorough consideration if and when Curare cures the underlying issue militating this Court to dismiss this case.

28

## IV.    CONCLUSION

For the reasons above, the Court **GRANTS** the Bluewater Parties' Dismissal Motion without prejudice to Debtor to cure the deficiency with the bankruptcy filing and refile.

Charles R. Merrill
United States Bankruptcy Judge

Dated: August 1, 2022

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| CURARE LABORATORY LLC | ) | |
| | ) | |
| Debtor | ) | Case No. 21-31588 |
| | ) | |

---

**ORDER**

---

This matter is before the Court on the *Debtor's Expedited Motion to Remove Custodian and Restore Possession, Custody, and Control to Debtor*, [D.E. 3], filed by Curare Laboratory LLC, the *Joint Motion to Dismiss Pursuant to 11 U.S.C. § 1112*, [D.E. 171], filed by Bluewater Toxicology, LLC, Solar Holdings Group, LLC, and Jennifer Bolus, and the *Motion for Summary Judgment as to Debtor's Motion to Restore*, [D.E. 181], filed by the Bluewater Parties.

Having considered the matter fully, and for the reasons set forth in the Court's Memorandum Opinion filed contemporaneously herewith, the Court **GRANTS** the Bluewater Parties' [D.E. 171] Dismissal Motion without prejudice to refiling, due to the apparent lack of authority to file bankruptcy.

Charles R. Merrill
United States Bankruptcy Judge

Dated: August 1, 2022